Bunker Hill Country Club et al., Appellants, v. John McElhatton et al., Appellees.

Gen. No. 37,997.

Opinion filed November 5, 1935.

John O. Wagner, of Chicago, for appellants.

Schofield & Wood, of Chicago, for appellees; Frank Schofield and David H. Kraft, of Chicago, of counsel.

Mr. Justice Sullivan delivered the opinion of the court.

This appeal seeks to reverse a decree sustaining defendant McElhatton's motion to strike plaintiffs' second amended complaint for insufficiency in law and form and to dismiss this cause for want of equity.

Plaintiffs are the Bunker Hill Country Club, an Illinois corporation (hereinafter for convenience sometimes referred to as the club), the individual owners of 2,665 of the 3,000 outstanding shares of preferred stock and 652 of the 2,000 outstanding shares of common stock of the club, and the individual owners of $43,500 second mortgage notes issued by it, the stockholders and holders of the notes acting not only in their own behalf but also in behalf of all those similarly situated. The original complaint in this cause was filed in March, 1934, an amended complaint April 16, 1934, and the second amended complaint July 2, 1934.

The pertinent allegations of the latter are that the club was incorporated for the purpose of owning and operating for profit a golf club and other enterprises incidental thereto; that it now is and was on July 14, 1927, the owner of a golf club consisting of approximately 115 acres of land located in Niles, Cook county, Illinois, improved with a golf course and a clubhouse and other buildings; that the individual stockholder plaintiffs were on July 14, 1927, and still are the owners of record of the number of preferred shares and of common shares of stock of the club set forth in the complaint; that the individual creditor plaintiffs are the owners of the principal amounts of the second mortgage notes specified in the complaint; that the trust deed securing said second mortgage notes is subject to a prior incumbrance in the principal amount of $109,300; that there is interest on the prior incumbrance due and unpaid amounting to approximately $9,000, as well as due and unpaid taxes against the club property of about $16,000; that there is approxi-

mately three years interest at six per cent due and unpaid on the second mortgage notes owned by the creditor plaintiffs; that on the date of filing the original complaint, and at all times since, the club was and is insolvent and unable to pay its obligations as they mature; that on the date of filing the original complaint its land, buildings, furniture, fixtures, machinery and equipment and all other assets of every kind and character were and are now worth less than $108,000; that the total liabilities, including the first and second mortgages, due and unpaid interest on same and due and unpaid taxes, were when the original complaint was filed and now are $156,000, an amount greatly in excess of the total assets of the club; that the club had authority to issue 3,000 shares of preferred stock of a par value of $100 a share and 2,000 shares of common stock of no par value, and that on July 14, 1927, there were and are now issued and outstanding 3,000 shares of preferred stock of the club of a par value of $100 a share, aggregating $300,000 and 2,000 shares of common stock of no par value; that under the articles of incorporation of the club its preferred shares of stock were to be preferred both as to its assets and earnings; and that on July 14, 1927, the board of directors of the Bunker Hill Country Club was composed of seven members, including defendant McElhatton.

It was further alleged that on said date McElhatton was the owner of 450 shares of common stock of the club; that, desiring to prefer himself over the creditors of the club and the other shareholders thereof, he demanded that the club purchase his 450 shares of common stock for $80,000 or more; that the company refused to do so; that he, ''disregarding his duties as director of said plaintiff corporation, thereupon in order to force and compel said corporation to purchase said . . . 450 common shares, entered upon a campaign of terrorism designed and intended to wreck and cause

great injury to plaintiff Bunker Hill Country Club; that said defendant John McElhatton called one or more meetings of certain of the members of said Bunker Hill Country Club and endeavored to induce them to resign from said club; that said defendant John McElhatton was on said July 14, 1927, assistant manager of said Bunker Hill Country Club in addition to being a director thereof, and in order by force, fear and intimidation to compel said Bunker Hill Country Club to purchase said . . . 450 common shares thereof as aforesaid, he refused to obey, perform and carry out the duties of assistant manager and director of said Bunker Hill Country Club, and said John McElhatton for the purpose aforesaid threatened to and proceeded to use various devices and artifices to persuade members of said Bunker Hill Country Club to resign and organize another golf club and some members did resign and did organize another golf club; that he made false and untrue statements concerning said Bunker Hill Country Club and threatened to take measures to disrupt and wreck said Bunker Hill Country Club; that the income from said Bunker Hill Country Club was largely derived from the revenue secured from the members thereof; that the resignation of such members would cause serious loss to said Bunker Hill Country Club, and that the acts of said John McElhatton seriously injured said Bunker Hill Country Club and caused it great financial loss; that because of said acts and threats and intimidation of defendant John McElhatton and because of and under fear and duress caused thereby the board of directors of said Bunker Hill Country Club for and in the name of said Bunker Hill Country Club entered into an agreement under date of July 15, 1927, to purchase from said defendant, John McElhatton, . . . 450 common shares for the sum of . . . $80,000, a copy of which said agreement is appended hereto as Exhibit A (B) . . . ; that in pursuance of said agreement the

directors of said Bunker Hill Country Club executed and delivered to said defendant, John McElhatton, the eight promissory notes of the plaintiff, Bunker Hill Country Club, in the principal amount of . . . $10,000 each, being in an aggregate principal amount of $80,000; . . . that pursuant to said agreement said . . . 450 common shares were deposited in escrow with the Chicago Title and Trust Company under an escrow agreement, a copy of which is hereto affixed as Exhibit B . . . , and are now in the possession of the defendant, Chicago Title and Trust Company, under said escrow agreement."

It was then averred that from July 15, 1927, when the contract and notes were executed, until this action was instituted in March, 1934, the club paid McElhatton interest on said notes to the amount of $20,950; that on July 14, 1927, the total value of the assets of the Bunker Hill Country Club was less than $400,000 and its liabilities exclusive of its issued outstanding shares of preferred stock were in excess of $112,000; that in addition to such liabilities the outstanding 3,000 shares of preferred stock of a par value of $100 a share, aggregating $300,000, were entitled to preference in that amount over the common shares of the club which were of only nominal value; that neither on July 14, 1927, nor on the dates when the original, amended or second amended complaints were filed did the club have any surplus available for the purchase of its stock and has no surplus now and is insolvent; that such contract to purchase its own stock was, ever since has been and is now illegal; that the contract to purchase McElhatton's 450 shares of common stock constituted and now constitutes an attempt to illegally prefer him over other shareholders and over creditors of the Bunker Hill Country Club and constituted an attempt to apply and divert the corporate assets to the personal benefit of McElhatton; and that the application of any assets of the club to the payment of the

aforesaid notes or any of them will be an illegal application of such assets, which will prefer McElhatton over other stockholders and defraud the creditors of the club.

Plaintiffs aver their willingness in the event that McElhatton returns the $80,000 notes, $20,950 interest received by him on same and interest on that interest, to cancel the escrow agreement under which the Chicago Title & Trust Company holds the 450 shares of common stock purchased by the club from McElhatton and held by it as security for the payment of the notes and the interest thereon. The complaint concludes with a prayer for the rescission of the contract between the club and McElhatton, for cancellation of the $80,000 notes and that the 450 shares of stock held in escrow by the Chicago Title & Trust Company be ordered delivered to the club to be held by it until McElhatton returns the interest theretofore received by him and interest on same. McElhatton's motion to strike this complaint and dismiss the cause for want of equity was sustained as were similar motions previously directed to the original and first amended complaints.

The second amended complaint was verified in behalf of plaintiff Bunker Hill Country Club by its president, B. F. Andresen, the owner of 1,500 shares of its preferred stock and 500 shares of its common stock at the time the complaint was filed, as well as at the time the contract for the purchase of McElhatton's stock was executed July 15, 1927. On that date he was also president of the club and one of its directors, and under the terms of the contract he personally guaranteed the payment of the notes. As such owner of 1,500 shares of preferred and 500 shares of common stock of the club, he is an individual plaintiff stockholder as are two other stockholders who were directors when the contract and notes were executed.

Incorporated as a part of and attached to plaintiffs' second amended complaint as "exhibit A" are the minutes of a meeting of the board of directors of the club held July 14, 1927, showing all seven directors present and B. F. Andresen presiding, at which meeting a resolution was adopted authorizing the contract to purchase McElhatton's stock.

On the following day, July 15, 1927, pursuant to the resolution adopted by the club's directors the previous day, the contract was entered into between the club and McElhatton. The notes were delivered to McElhatton. The 450 shares of stock were delivered by McElhatton to the club, indorsed in blank in its behalf by its officers and deposited in escrow with the Chicago Title & Trust Company as security for the payment of the notes and interest thereon. Thereupon McElhatton resigned as director of the club and from his $100 a week position as its assistant manager.

Did the six disinterested directors of the Bunker Hill Country Club's board of seven, who were obviously adverse and hostile to McElhatton, the seventh, in the particular transaction, have the right to authorize the contract for the purchase of his stock in the club and the execution and delivery of its notes in payment thereof?

The great weight of authority in this and the majority of jurisdictions is that a director may deal or contract with his corporation where he acts in good faith and the corporation is represented by a quorum of disinterested directors or other independent officers. (Fletcher Corp., vol. 3, ch. 11, sec. 931; 14 A. C. J., p. 118.)

There is no charge that any of the other six directors were in collusion with McElhatton and the logical inference is that they were not only disinterested in his welfare, but were adverse and hostile to him. This being so we know of no legal inhibition against the board of directors entering into a valid contract in

behalf of the corporation with McElhatton for the purchase of his stock.

The law is well settled in this State that such a contract is legal and binding upon the corporation if authorized in good faith and in its best interests while solvent by a disinterested majority of its directorate acting not in collusion with or in the interest of the contracting director or in prejudice of creditors. The pleadings show no restriction in the club's articles of incorporation against the purchase of its own stock. The club was admittedly solvent when the contract in question was entered into July 15, 1927, inasmuch as in the first amended complaint its total net assets were alleged to have been more than $320,000 and in the second amended complaint "less than $400,000," and its liabilities about $112,000 at that time.

It is claimed that the $300,000 preferred stock then issued and outstanding should also be held to be a liability of the corporation, and, if so considered, that the club was insolvent when the contract was made. This position is untenable. The club's articles of incorporation provide in part:

"The holders of preferred stock shall be entitled to receive, when and as declared from the surplus or net profits of the corporation, dividends at the rate of six per cent (6%) per annum on the par value thereof . . . . Dividends on such preferred stock shall be cumulative. In the event of any dissolution, liquidation or winding up of the corporation or the sale of its assets whether voluntary or involuntary, or in the event of its insolvency, or upon any distribution of its capital, there will be paid to the holders of the preferred stock the par value thereof, to-wit $100.00 per share, and the amount of all unpaid dividends thereon before any sum shall be paid or any assets distributed among the holders of the common stock. . . ."

In *Gibson v. Bedard,* 173 Minn. 104, in passing upon a like contention, where a substantially similar provision was contained in the articles of incorporation before that court, it was said at p. 108:

"The preferred stock does not, as contended on behalf of appellants, have a lien on all the capital and assets of the corporation. It has, however, a preference, under the provisions of the articles which constitute the contract, over the common stock as to certain earnings of the corporation and as to assets on dissolution for a stated amount. But there is no allegation of any violation of the contract in these respects . . . .

" . . . In dealing with contracts challenged on the ground of fraud, actual or constructive, the term 'insolvency' has reference to insufficiency of assets of the debtor to cover his liabilities."

In our opinion the article heretofore set forth merely confers a preference to the holders of the preferred stock of the club as to the distribution of dividends and division of property and assets of the corporation in the event of its dissolution, liquidation or insolvency.

It is urged that the creditor plaintiffs, even though they became such subsequent to the purchase of McElhatton's stock by the club, may attack the transaction. While there is no allegation in the second amended complaint as to when they became creditors, the first amended complaint alleges that the second mortgage was placed upon the club property March 31, 1931, and it thus appears that all of the creditor plaintiffs who are holders of notes under the second mortgage did not become creditors of the club until nearly four years after its purchase of McElhatton's common stock. It has repeatedly been held by the courts of review of this State that a corporation's purchase of its own stock is not subject to attack by creditors unless at the time of the transaction they were existing creditors in respect to whose rights such purchase was

fraudulent or at the time the purchase was made the corporation was insolvent or in process or contemplation of dissolution. (*Republic Life Ins. Co. v. Swigert,* 135 Ill. 150; *Clapp v. Peterson,* 104 Ill. 26; *Fraser v. Ritchie,* 8 Ill. App. 554.) If such a purchase was made with the fraudulent intent to hinder or defraud subsequent creditors, it would also be clearly invalid and subject to attack. (*Melvin v. Lamar Ins. Co.,* 80 Ill. 446; *Olmstead v. Vance & Jones Co.,* 196 Ill. 236.) It surely cannot be said that this purchase of stock by the club, consummated nearly four years before the creditor plaintiffs came into existence, was made when the corporation was in process or contemplation of dissolution or with the fraudulent intent to hinder or defraud them. The creditor plaintiffs, in our opinion, have no right to question the validity of the corporation's contract with McElhatton.

Was the contract made in good faith and in the best interests of the corporation? The corporation was solvent and much more than able to pay its debts in July, 1927. When B. F. Andresen conceived the idea and incorporated the golf club in 1924, McElhatton was golf "pro" at a country club near Chicago, of which Andresen was a member. He immediately employed McElhatton as his assistant manager, and as part of his duties he sold stock in the club and obtained playing members, at a salary of $100 weekly, which he received until the contract was made and he severed his connection with the club July 15, 1927. The resolution adopted by the board of directors of the club July 14, 1927, and heretofore referred to as "Exhibit A," recited, among other things, that "whereas controversies and differences having arisen between John McElhatton and the corporation respecting the conduct, operation and management of the business and affairs of the corporation, and whereas it is deemed *desirable* and for the *best interests* of the corporation

that all of the controversies and differences existing between . . . McElhatton and the corporation be settled and adjusted . . . therefore be it resolved that Bruno Fred Andresen, president of the corporation, and Ernest H. Allen, secretary of the corporation, be and they are hereby authorized and empowered for and on behalf of the corporation to accept the offer of the said John McElhatton to sell to the corporation 450 shares . . . of its common stock without nominal or par value for the sum of . . . $80,000.''

The contract with McElhatton was not exclusively a transaction involving a sale of his stock to the club. It also provided that for seven and one-half years from the date of the contract he was not to become engaged in any capacity with the Tam O Shanter Golf Club in the Chicago district or any other golf club (with certain exceptions) within a radius of five miles of the property of the corporation without the consent in writing of the club. As a result of the contract he was required to resign as director of the club and to relinquish his position as assistant manager, which paid him a salary of $100 weekly. In short, his entire relationship with the club was severed, enabling it to dispense with what was considered by it at that time a disrupting force fraught with loss and failure to it.

In *Joseph v. Raff*, 82 App. Div. 47 (81 N. Y. S. 546), an almost parallel case, where there was dissatisfaction and controversy as there was here, and where the president, who was also a director, refused to resign unless the corporation purchased his stock, the court held at p. 552:

''This being for the best interests of the company, it was proper for the directors to endeavor to secure the defendant's resignation; and it was lawful for him to resign, and to impose as a condition that he receive the amount owing to him by the company and a reasonable allowance for giving up his salaried position. It was also lawful for him to refuse to resign the man-

agement of the company unless his stock was taken off his hands.

". . . Furthermore, the transaction having been had in entire good faith, and not in contemplation of the insolvency of the company, the company would be estopped, and we think its subsequent creditors should also be estopped, from questioning the validity of the purchase of the stock by the company from the defendant, since it is impossible to rescind the sale and restore him to the position he then occupied. Had he remained director and president, as he might and doubtless would have done but for this agreement, he would have had the benefit of his individual judgment in the management of the affairs of the company for the protection of all stockholders, including his own interest as such."

Interest amounting to $20,950 was paid on the notes over a period of more than six years subsequent to the making of the contract, and this action was not instituted until nearly seven years after the contract was executed and the notes delivered. It is a matter of common knowledge that golf clubs were in the ascendency and that there was an active rising market for acreage property in the Chicago district in 1927. All courts have taken judicial notice of the depression with its repercussion in land and other values, and the fairness of the contract and the good faith of the parties must necessarily be viewed in the light of conditions as they were in 1927 and not in retrospect. We are impelled to conclude that the facts alleged are insufficient to show that the contract was made in bad faith and not in the best interests of the club.

Plaintiffs claim that the board of directors of the club were induced to authorize the contract by the fraud and duress of McElhatton. An examination of the second amended complaint reveals that there are no well pleaded facts showing either. The only reference in the complaint to fraud on the part of McElhatton is "that he made false and untrue statements

concerning the Bunker Hill Country Club," which is obviously a conclusion and manifestly insufficient to charge fraud. It is an established rule that allegations contained in a complaint must be construed most strongly against the plaintiff and that only such facts are admitted by a motion to strike as are well pleaded in the complaint. Such a motion admits none of the conclusions or inferences drawn by the pleader. (*Lindemann & Hoverson Co. v. Advance Stove Works,* 170 Ill. App. 423; *Betten v. Williams,* 277 Ill. App. 353.)

Plaintiffs' charge of duress is based solely on the assertions in the complaint that McElhatton "entered upon a campaign of terrorism designed and intended to wreck" the club; that he "called one or more meetings of certain members and endeavored to induce them to resign" from the club; that in order "by force, fear and intimidation" to compel the club to purchase his stock, he refused to perform his duties; that he threatened to and proceeded to use various devices and artifices to persuade "members of the club to resign and organize another golf club"; that he "threatened to take measures to disrupt and wreck the club"; and that, "because of such acts, threats and intimidation, and, because of and under fear and duress caused thereby," the board of directors entered into the agreement with him. These allegations are merely a statement of conclusions, without any foundation of fact. It is well settled that facts showing duress must be stated in the complaint. (*Betten v. Williams, supra.*) There is no allegation that any wrongful word, act or conduct of McElhatton rendered the directors of the club incompetent to contract with the exercise of their "free will power." (*Wood v. Telephone Co.,* 223 Mo. 537.) Nor is it alleged that the corporation and its disinterested directors were without reasonable opportunity to institute proceedings in equity to protect themselves against the designing, oppressive or unlawful acts of McElhatton, if there were any such. (*Illinois Merchants Trust Co. v. Harvey,* 335 Ill. 284.)

There is no allegation in the complaint from which it can be inferred that there was anything fraudulent or illegal in McElhatton's transaction with the club or that the contract was made under duress.

In any event the resolution of the board of directors authorizing the contract recites that differences and controversies respecting the operation and management of the club had arisen between it and McElhatton and that it was deemed *desirable* and for the *best interests* of the club that all such differences and controversies be settled and adjusted by accepting McElhatton's proposal that he be paid $80,000 for his stock.

It is well settled law in this State that where there is discrepancy or contradiction between allegations in a complaint and facts as shown in an exhibit attached to and made a part of the complaint, the exhibit will control; and that a motion to strike the complaint does not admit such allegations as are in conflict with facts disclosed by such exhibit. (*Lyons v. 333 North Michigan Ave. Bldg. Corp.*, 277 Ill. App. 93.)

The allegations of the complaint which attempt to charge fraud and duress are clearly in conflict with and refuted by the facts contained in the resolution, and the recital in the exhibit containing the resolution that the contract was "desirable and for the best interest of the corporation" must be held to be controlling.

Even though it were possible to hold the complaint sufficient, it was not filed, as noted above, until nearly seven years after the transaction in question, and any cause of action in connection with it is barred by the statute of limitations. Plaintiffs say that they did not learn of the existence of the alleged cause of action until a few months before the filing of their complaint because of its careful concealment by the club's directors and thus attempt to evade the statute. This does not prevent the running of the statute, however, as there is no allegation of fraudulent concealment by McElhatton. (*Parmelee v. Price*, 208 Ill. 544; *Lan-*

caster v. Springer, 239 Ill. 472; Keithley v. Mutual Life Ins. Co., 271 Ill. 584; Jackson v. Anderson, 355 Ill. 550.) In the Jackson v. Anderson case, supra, the court said at p. 557:

"Mere silence of the defendant and mere failure on the part of the complainant to learn of a cause of action do not amount to such fraudulent concealment. (Fortune v. English, 226 Ill. 262; Lancaster v. Springer, supra; Parmelee v. Price, supra.) Furthermore, we have held that good faith and reasonable diligence are essential elements in asking for relief from a court of equity. (LeGout v. LeVieux, 338 Ill. 46.) There is no showing of any reason why the complainants could not have learned in 1926 of the facts which they claimed to have learned in 1931. There is no showing of any diligence to learn such facts, and it is hardly consistent with good faith to hold a valuable piece of property through the economically fat years, and then, during times that are economically lean, seek to repudiate the deal whereby it was acquired."

We are of the opinion that the disinterested majority of the board of directors of the corporation had the right and authority to make the contract with McElhatton, which was advantageous to it at the time it was made, and authorize the execution and delivery of the notes to him; that such contract was entered into in good faith while the corporation was solvent; that neither fraud nor duress that might vitiate it is sufficiently alleged in the complaint; that the instant action is barred by the statute of limitations; and that the contract and notes are legal, binding and enforceable.

For the reasons indicated herein the decree or order of the circuit court sustaining defendant McElhatton's motion to strike the second amended complaint and to dismiss the cause for want of equity is affirmed.

*Affirmed.*

SCANLAN, P. J., and FRIEND, J., concur.