The bill in this case was filed for the appointment of a receiver and the winding up of the defendant corporation, under the statute.
Adolph U. Poppenga filed proof of claim, as creditor, with the receivers, which was disallowed by them; from such disallowance the claimant has appealed.
Poppenga's claim is based upon a written agreement, dated July 9th, 1924, between himself and the defendant lumber company, whereby he agreed to sell and the lumber company agreed to buy from him one hundred and fifty shares of the capital stock of the lumber company for $40,000.
The agreement provides that Poppenga "hereby sells" and the lumber company "hereby purchases" the said stock; and that the purchase price is to be paid by the lumber company in installments of $1,000 each, every three months, commencing October 9th, 1924, together with interest on the balance unpaid from time to time; that upon final payment in full Poppenga will transfer the shares to the lumber company; that Poppenga shall have right to repurchase the said shares "at any time during the continuance of this agreement" by repaying to the lumber company the moneys theretofore paid by it.
Prior to the appointment of the receiver in this suit, the lumber company had paid $13,500 (with interest) on account of the $40,000 purchase price. Poppenga's claim is for the balance, $26,500, together with interest from January 15th, 1931.
The receivers concluded that by reason of the determination inHoover Steel Ball Co. v. Schaefer Ball Bearing Co., 90 N.J. Eq. 164; 106 Atl. Rep. 471, and the cases therein cited, the claim must be deemed invalid and unenforceable. The facts in the present case are different in several particulars from those in the Hoover Case, and it is contended by *Page 36 
claimant-appellant that these differences are of such materiality as to relieve the present claim from the interdiction of that decision. It is concluded that this contention is well founded; that the claim is valid and the appeal must be sustained.
The holding in the Hoover Case is that a contract by a corporation with a purchaser of its stock, contemporaneously with such purchase, for the future re-purchase of such stock by the corporation at the option of the purchaser, cannot be enforced against an insolvent corporation to the detriment of its creditors. In the instant case the contract was a presently operative purchase — not an executory contract to purchase infuturo; it gave no right to the stockholder to continue his status as a stockholder as long as he deemed it profitable and then later to convert himself into a creditor at the expense of other creditors — it converted him at once into a creditor and not a stockholder (although there was a clause giving him the option to repurchase the stock); and the corporation, at the time of making the purchase, was not insolvent but had a large net surplus.
The basic principle in the Hoover Case is that the assets of a corporation are primarily liable for the payment of its debts and that the stockholders cannot take the corporate assets to repay themselves the money they invested, if such action leaves the corporation without sufficient assets to pay its creditors; they cannot do so in praesenti, nor can they make an enforceable agreement to do so in futuro. On the other hand, however, the assets of a corporation over and above the amount required to pay its creditors, are the property of the stockholders and can be withdrawn by them for their individual benefit in such manner as they agree on.
Suppose a corporation with assets of $100,000, debts of $10,000, and outstanding capital stock of $10,000 held in equal amounts by ten stockholders. There could be no objection if that corporation (all stockholders consenting) should reduce its capital stock by purchasing from each stockholder one-half his holdings for $500 per share — since ample assets would be left to pay all creditors; likewise there could be no *Page 37 
objection to such a purchase from a single stockholder only — if the other stockholders all consented. And if such a purchase would be valid if the money were then and there paid out of the corporate treasury, it is not perceived why the purchase would be invalidated if the company instead of giving its check in payment gave its note or its other obligation for deferred payment. The contract would be complete; the corporate assets necessary to pay debts would be no differently affected; the corporation's creditors would have no greater right to complain. The stockholder would become a creditor — an unpaid creditor instead of a paid vendor; but the debt due him, being valid then, would not become invalid by reason of the company subequently becoming insolvent before the date of the debt's maturity.
The court of errors and appeals determined in Berger v.United States Steel Co., 63 N.J. Eq. 809; 53 Atl. Rep. 68, that a corporation organized under the General Corporation act of this state has the power to purchase shares of its own stock, "for legitimate corporate purposes;" that it may just as validly purchase on credit as for cash; and that it may give security for the credit extended to it. No rights of creditors were involved in that case; the issues were raised not by or on behalf of creditors, but by stockholders. The principles therein enunciated must of course be deemed to be limited by the rights of creditors if any such are involved or affected in a given case; but both on reason and authority the conclusion seems inescapable that a corporation may purchase shares of its own stock, for "legitimate corporate purposes," and may, instead of paying cash therefor, issue its obligation payable at a future date, and that the vendor holding such obligation becomes forthwith a creditor (instead of a stockholder) of the company and entitled to rank equally with other creditors in the event of subsequent insolvency of the company, provided that at the time of the purchase the company has sufficient assets to pay its creditors in full and provided the purchase is not made in disregard of the equitable rights of other stockholders.
In the instant case the company admittedly had far more *Page 38 
than sufficient assets to pay its creditors in full, and all of the stockholders expressly consented to the purchase. Under such circumstances it may well be doubted that much, if any, consideration need be given toward the determination of what is a "legitimate corporate purpose." Aside from the rights of creditors (which in the instant case were in nowise prejudiced or infringed), and the right of the state that no criminal or fraudulent act be perpetrated (which is in nowise intimated in the present case), it would seem that the stockholders are the only ones interested, and that any purchase might be made to which all stockholders expressly assented. If, however, the "legitimate corporate purpose" be deemed a requisite even under such circumstances, no doubt is entertained as to its existence in the case at the bar.
The corporation was involved in litigation wherein persons having a "life estate" in the "inchoate" dividends of certain shares of stock of the company (held by trustees, in trust to pay the "income" on that stock, during the life of a third party, to the litigating complainants and to transfer the stock at the death of the third party to other beneficiaries of whom Poppenga was one) sought to obtain payment of dividends to themselves out of accumulated profits of the company.
An opinion had been filed in the litigation, foreshadowing the possibility, if not the probability, of a decree that the corporation should pay such dividends out of the accumulated profits. The accumulated profits had been put back into the business, so that it would have been very difficult, if not impossible, for the corporation to have paid such dividends at that time without liquidating its affairs, notwithstanding it was amply solvent, as has been said.
The interest or share in the corporate assets represented by these shares of stock held in trust belonged partly to the "dividend" beneficiaries and partly to Poppenga and the other "stock" beneficiaries. If the corporation paid the dividends to the former the value of the shares of stock to which Poppenga and his associates were entitled would be pro tanto diminished, whereas if Poppenga and his associates advanced to the corporation the money to pay the dividends, the amount *Page 39 
of their individual assets (aside from the stock) would be thereby decreased but this would be compensated for because the value of the shares of stock would not be diminished: the net result to Poppenga and his associates would be substantially the same under either plan, except that for the corporation to pay the dividends out of the corporate assets would have entailed such a sacrifice of corporate assets as to result in still greater diminution of the value of the "stockholders" stock, and they all felt it would be much better for themselves and the other stockholders of the company (who also naturally felt the same way about it) if they should advance the dividend money to the company.
Unfortunately Poppenga was unable or unwilling to advance his share out of his other individual assets, and therefore in order to enable him to get the money to make the necessary advance, this sale of one hundred and fifty of his shares of stock to the company was agreed on (being at a price higher than he could get elsewhere, yet lower than the book value); and in order to accommodate the company's situation the payment of the purchase price was made deferred and payable in installments. The immediate cash necessary to make the payment to the "dividend beneficiaries" was obtained from a bank, on Poppenga's note with collateral, including the stock and the company's agreement to pay Poppenga the $40,000.
The purchase by the company was therefore part of an entire transaction intended, and believed to be, and agreed upon by all stockholders as being — and which apparently in fact actually was — for the benefit not only of Poppenga but also of all the other stockholders of the company. (It does not appear that the present unfortunate financial situation of the company was in anywise attributable to this transaction, or that it could have been foreseen at that time.) The corporation is simply the stockholders in corporate form; the interests of the stockholders are the interests of the corporation; the purpose of the corporation is to benefit the interests of the stockholders. The legitimate benefit of the stockholders is therefore a legitimate corporate purpose, especially when all agree. *Page 40 
It is not intended by anything that has been said herein to intimate that a purchase by a corporation of shares of its own stock would be valid if the then present ability of the corporation to pay its creditors in full was in anywise open to doubt — if, for instance, although then honestly believed to be fully solvent, it should later appear doubtful that the company had in fact been then fully solvent. That situation does not exist here, and no opinion is expressed thereon.
Most of the facts were not in dispute and were stipulated, but testimony was taken as to a few controverted points. The position taken by the claimant, while not expressly charging fraud, contained a distinct implication that he had been imposed upon or influenced for the benefit of others rather than for his own interests, that the transaction was not for his benefit but for the benefit of the "company" or the other stockholders, and that he had been induced to enter into it by reason of representations made by them and without really understanding it. It is entirely clear from a consideration of the testimony and the other facts, that none of this was true, and that Poppenga's present notion is probably due to the fact that his intelligence is not of the highest order and that his memory is defective. The company is only another name for the stockholders comprising the company — the transaction was for the benefit of the company, i.e., the stockholders; obviously it was also for the benefit of Poppenga. The evidence shows that he understood the transaction at the time it took place, and that he was in nowise defrauded or imposed upon; that on the contrary the sale of stock was devised primarily for his benefit, because he did not want the company to run the risk of having to liquidate, and yet was unwilling to sell his stock (he was offered $100,000 for his five hundred shares) and was also unwilling to draw on his savings to pay his share of the amount due the dividend claimants.
The appeal will be sustained and the claim allowed as that of a general creditor; but under all the circumstances costs of the appeal will be awarded against him. *Page 41