**Levin et al., Appellants, *v.* Pittsburgh United Corporation (et al., Appellants).**

**Peoples–Pittsburgh Trust Company (Appellant), *v.* Pittsburgh United Corporation (et al., Appellants).**

458

Argued March 31, 1938.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles H. Sachs,* with him *Louis Caplan* and *Sachs & Caplan,* for appellants, in Nos. 47-49.

*Charles F. C. Arensberg,* with him *James S. Craw-ford, Ella Graubart* and *Patterson, Crawford, Arensberg & Dunn,* for appellant, in Nos. 50 and 67.

*Earl F. Reed,* with him *Roy G. Bostwick, John E. Laughlin, Jr., James A. Bell* and *Thorp, Bostwick, Reed & Armstrong,* for appellants, in Nos. 51 and 52.

*Henry Eastman Hackney,* with him *Charles Denby, Jr., David A. Reed* and *Reed, Smith, Shaw & McClay,* for appellants, in Nos. 54-59, and in Nos. 60-65.

*Maurice Walk,* with him *E. Lowry Humes,* for appellants, in Nos. 69-72.

*Alexander J. Barron,* with him *Thomas Watson, Gifford K. Wright* and *Alter, Wright & Barron,* for defendant-appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, May 9, 1938:
The Oil Well Supply Company was incorporated in 1891 for the purpose of manufacturing and selling oil-well supplies and equipment. It had a capitalization of $1,500,000 consisting of common stock only. In 1925, with assets in excess of $23,000,000 the capital was increased to $22,000,000. The authorized capital stock was increased to 70,000 shares of 7% cumulative preferred and 600,000 shares of common stock with respective par values of $100 and $25 a share. The new common and preferred stock were distributed in exchange for the old common stock, and at the time of this suit there were issued and outstanding approximately 58,000 shares of preferred stock and 390,000 shares of common stock.

In September of 1930, the Oil Well Supply Company sold all of its property and assets, including the use of its name, to the United States Steel Corporation, receiving therefor 108,402 shares of United States Steel com-

mon. Ten thousand of these shares were deposited in escrow to insure guarantees respecting inventories and accounts receivable. These guarantees were fulfilled a year later and the stock returned. The Oil Well Supply Company changed its name to Pittsburgh United Corporation, hereinafter called United.

At the time of the sale to the United States Steel Corporation the common stock of the latter sold at $155 a share, and the market value of the stock received by United was approximately $16,900,000. Had United liquidated when the sale was made, the preferred stock could have been retired at $110 a share and the common stockholders would have received about $24 a share; it could have done so except as to the 10,000 shares of Steel common held in escrow. Following the United's sale of its assets, William B. Schiller and certain other preferred stockholders demanded their stock be retired. The directors of United declined to accede to their demand. On March 14, 1931, these stockholders instituted an action in equity to compel the liquidation of the company's assets and the retirement of the outstanding preferred stock. They charged the directors intended to use the corporation as a holding company or investment trust in order to speculate with its holdings of Steel common in the interest of common stockholders. Shortly after the Schiller suit was instituted Steel common dropped to $144 a share, but even at that price United preferred could have been retired at $110 and the common would have received $21 a share. In April of 1931, at the annual meeting of stockholders, when a resolution to liquidate United was presented, the common stockholders defeated it by a vote of 264,000 to 17,000.

The stock market depression set in, and from a high during the month of April, 1931, of $140 per share, Steel common fell until all equity for common shareholders of United had disappeared, and a complete liquidation could have only partially paid off the preferred. In the spring of 1932, if the preferred shareholders had suc-

ceeded in their equity action, the possibility of the common stockholders ultimately receiving anything whatsoever in a liquidation of the company would have been forever foreclosed. At that period the latter had nothing more to lose. There was the possibility, however, of a future recovery in the market, whereby some value might be given to the common stock, if the preferred stockholders might be persuaded to withdraw their suit and consent to a postponement of liquidation.

Negotiations were therefore entered into by the directors for the settlement of the Schiller suit. This was accomplished by an agreement dated March 1, 1932, when Steel common was selling at $40 per share. The principal object of the agreement was the conservation of the company's assets in the hope that the stockholders would profit thereby. Steel common was selling at $30 a share when this compromise agreement was finally approved by the stockholders of United on April 19, 1932, by a vote of approximately 225,000 to 30,000. The only shares voted against it were those owned or controlled by Chickering, one of the defendants in the pending action, and the 100 shares of Foster Brown. The Peoples-Pittsburgh Trust Company was named as trustee to carry out its object.

The main purpose of that agreement was to give United until March 1, 1937, to retire its indebtedness (amounting to $1,040,000) and to liquidate its preferred stock at $110 plus all accrued and unpaid dividends. In the meantime, the agreement provided for the funding and refinancing of the corporate indebtedness; for the restriction of the corporate activities to those essential to its bare operation; for the non-incurring of new indebtedness; for the application of any cash receipts received by the corporation. During the period prior to November 1, 1936, if the assets of the corporation permitted the liabilities and the preferred stock, at $110 plus accrued dividends, to be liquidated, the corporation further covenanted to make an offer to

liquidate all preferred stock, the holders of which accepted the benefits of the offer. The agreement finally provided: "Tenth. It is the purpose of this agreement and the intention of the parties hereto that each holder of shares of preferred stock . . . shall be afforded an opportunity to have his preferred shares retired on March 1, 1937, at the liquidating value thereof. . . ." Notices were to be mailed by the trustee to all holders of preferred stock of their right to have their stock liquidated on March 1, 1937, and for the stamping of stock presented in acceptance of such offer. The retirement value thereof was to be determined in the following manner: The assets and liabilities of the company were to be valued as of February 16, 1937, and such proportion of the assets was to be delivered to the trustee as the number of shares assenting to the retirement bore to the total number of preferred shares issued and outstanding. These assets were termed "Retirement Fund Assets." A similar proportion of the liabilities was then to be ascertained, which was nominated "Retirement Fund Liabilities." The trustee was required to deliver to the company out of the Retirement Fund Assets an amount equal to the Retirement Fund Liabilities prior to March 1, 1937. After such transfer the liability of United to the holders of preferred stock assenting to retirement was at an end. The trustee was directed on or after March 1, 1937, to distribute the United States Steel common and/or the cash remaining in its hands as Retirement Fund Assets, pro rata among the holders of preferred stock who had assented to retirement of their shares. Then followed this important proviso: "that such distribution to the said holders of preferred stock shall not exceed $110 per share plus accrued and unpaid dividends to March 1, 1937, in cash and/or Steel common at its closing market value on the New York Stock Exchange as of the close of business on February 28, 1937."

The Schiller suit having been discontinued, the United directors continued the management of the company, restricted as it was to the conservation of its assets. Certain corporate activities were carried on at a minimum of expense; dividends were collected and paid during 1931; occasional loans were made; small lots of preferred stock were redeemed; stockholders' annual meetings and directors' meetings were held from time to time and other minor business matters transacted. When notice of the right to redeem was sent by the trustee to preferred stockholders on November 2, 1936, setting February 10, 1937, as the final date for marking preferred shares for retirement, all but the holders of approximately 5,000 shares took advantage of it. Chickering, the protesting stockholder, had his shares stamped for retirement, but at the same time filed a letter of protest.

Future developments justified the Schiller agreement. General business conditions improved between the time of its execution and March 1, 1937. On the latter date, Steel common had risen to about $112 a share and at that price the corporate assets showed an equity for common shareholders, after retirement of all preferred stock of $110 plus all accrued and unpaid dividends to date. Just prior to the date of distribution, or in the latter part of February, Chickering and other common stockholders instituted actions against the corporation to enjoin it from carrying out the agreement. Two suits were entered, one in the Common Pleas Court of Allegheny County and one in the federal court. Peoples-Pittsburgh Trust Company, as trustee, was then advised by United that because of the institution of these suits it could not perform the agreement. Thereupon, on March 6, 1937, the trustee filed its bill for specific performance of the agreement, and at the same time two preferred stockholders instituted similar actions. The suit in the federal court has been dropped and the Chickering action remains open, but all parties inter-

ested and concerned in that litigation are parties to the present suit.

Appellants, Chickering and those associated with him, predicate their attack on the agreement of March 1, 1932, on the ground that it was ultra vires. They contend United was in liquidation when it sold its assets; that the Schiller agreement was based upon that assumption; and that the contract could not validly provide for dividends to continue to accrue on the preferred stock after the date of liquidation. They urge that if they are not correct in assuming the corporation went into liquidation, then the agreement was invalid because it altered the rights of the preferred stock with reference to dividends, distribution, redemption and liquidation to the prejudice of common stockholders, particularly in providing for payment of dividends without regard to the availability of corporate profits or earnings for that purpose. This might be answered by holding that if the agreement was vulnerable in these respects, Chickering and those associated with him have been guilty of laches. It would be most inequitable to permit them to stand by, speculating on and taking advantage of the benefits of the agreement for five years, to see Steel common rise from $30 to $112 a share, giving them a substantial equity, and then turn up as objectors at the end of that time.[1] But we need not decide this case on such grounds.

Appellants' position to-day is inconsistent with that adopted by them and the corporation in defense to the Schiller suit. Therein, Schiller asserted the right to liquidation. This was opposed by the common shareholders and the corporation. In the answer to that bill

---

[1] *Watt's Appeal,* 78 Pa. 370; *Commonwealth v. Reading Traction Co.,* 204 Pa. 151; *Graff v. Williamsport Water Co.,* 312 Pa. 255, 257; *Bonini v. Family Theatre Corp.,* 327 Pa. 273, 280; *Weschler v. Buffalo & Lake Erie Traction Co.,* 51 Pa. Superior Ct. 92; *Kalbach v. Marine-Galligan* Co., 92 Pa. Superior Ct. 185..

it was alleged that the corporation had reserved for future decision the question whether it would (a) hold the shares of United States Steel; (b) sell these shares and engage in business within the scope of its charter; or (c) dissolve.

Whether the preferred shareholders engaged in that litigation could have forced liquidation, or at least a partial liquidation, so as to secure their pro rata share of the corporate assets, we do not now determine. In support of the argument that United went into liquidation at the time it sold its assets, our attention has been directed to authorities holding that on consolidation or merger,[2] or sale of corporate assets,[3] dissenting shareholders are entitled to receive back their proportionate share of the corporate assets, but these authorities, far from showing the result of such transactions gives rise to complete liquidation, lend color to the original theory upon which the Schiller suit was prosecuted. They establish that a dissenting shareholder cannot be compelled to take part in a corporate enterprise differing from that in which he made his original investment, and is entitled to a return of his pro rata share of the assets when a corporation ceases, at least temporarily, to function under its original purposes. They do not hold that after a transaction similar to the one before us, the remaining stockholders and the corporation may not embark again upon the same business or, by amending its charter, proceed into new enterprises.

The inevitable legal result of a sale of corporate assets is not necessarily dissolution to be followed by com-

---

[2] *Lauman v. Lebanon Valley Railroad Co.*, 30 Pa. 42; *Barnett v. Phila. Market Co.*, 218 Pa. 649; *Maxler v. Freeport Bank*, 275 Pa. 510; *Petry v. Harwood Elec. Co. (No. 1)*, 280 Pa. 142; *Ringler v. Atlas Portland Cement Co.*, 301 Pa. 176; *Ferrando v. U. S. National Building & Loan Assn.*, 307 Pa. 25; *Nice Ball Bearing Co. v. Mortgage Building & Loan Assn.*, 310 Pa. 560.

[3] *Koehler v. St. Mary's Brewing Co.*, 228 Pa. 648.

plete liquidation.[4] We will examine the facts surrounding United and its shareholders at the time of the sale of its assets and thereafter while the agreement of March 1, 1932, was in operation, to determine whether this was the intention of the corporation and its shareholders. The corporation itself definitely rejected any thought of liquidation by its answer filed in the Schiller suit. Its common shareholders opposed the idea by voting down a resolution proposed for that purpose.[5] Evidently, neither the corporation nor its common shareholders, nor even the great bulk of its preferred shareholders (not being parties to the Schiller action), contemplated or desired a liquidation by the sale of the remaining assets of the corporation. Since 1931 the company has collected dividends on its holdings of stock; made transfers of earnings to its sinking fund; redeemed small lots of stock, paid taxes and salaries; held annual meetings of stockholders and meetings of its Board of Directors; and has otherwise engaged in minor activities necessarily limited by the agreement of March 1, 1932. In view of the attitude of both the company and its stockholders prior to the execution of the Schiller agreement it was entirely open to the company to have reëngaged in its former business to an extent not violative of the agreement with United States Steel. It could have amended its charter and engaged in other business activities. The agreement resulting from the compromise of the Schiller suit was not predicated on the assumption of liquidation. It was of the utmost importance to prevent liquidation, and the agreement was

---

[4] See Fletcher, Cyclopedia Corporations (Perm. Ed.), Sections 2953, 7999, and see *Ringler v. Atlas Portland Cement Co.*, 301 Pa. 176, 178; *Franklin Nat. Bank v. Kennerly Coal & Coke Co.*, 300 Pa. 479, 484; *Matter of Fulton*, 257 N. Y. 487.

[5] The power to bring about a voluntary liquidation was in the hands of the common shareholders by virtue of the then effective Act of April 9, 1856, P. L. 293, section 1. See also Fletcher, Cyclopedia Corporations (Perm. Ed.), section 8020.

written in the interest of the common shareholders. Such of the terms of that contract demanded by the litigating preferred shareholders—namely, the inhibition on corporate activities and the specific provisions for partial liquidation—represent the price the great majority of common shareholders (by their approval of the agreement) were satisfied to pay to procure the settlement of the controversy and deferment for five years of an apparently conceded right to have at that time a pro rata distribution to the litigating preferred shareholders. By the action of the common shareholders in resisting the effort to liquidate in 1931, and their conduct subsequent to the Schiller agreement in 1932, they exercised their right to continue the company as a going concern for the limited purpose of conserving the assets, fixing as the time for a pro rata distribution of capital assets to such preferred shareholders as desired it, March 1, 1937.

But even at this latter date, complete liquidation of United was not necessarily inevitable. At the price United States Steel had reached on that date the corporation had assets in excess of its liabilities to all preferred shareholders. These assets were available to the corporation and its common shareholders for the purpose of resuming such of its corporate activities as it desired. The Schiller agreement accomplished for the preferred shareholders taking advantage of its benefits the objects of the original bill in equity as of a date five years later. The effect of the agreement was to accomplish a partial distribution of capital but not a complete liquidation.

Having held United was not in liquidation, the principle that preferred dividends do not accrue during the period a corporation is winding up or liquidating[6] has

---

[6] *Penington v. Commonwealth Hotel Construction Corp.*, 17 Del. Ch. 394; *Drewry–Hughes Co. v. Throckmorton*, 120 Va. 859.

no bearing. This is the principle sought to be applied by these appellants.

When United issued its preferred stock the contract of the company with the preferred stockholders provided that upon dissolution, voluntary or involuntary, or upon liquidation "or upon any distribution of . . . capital assets," the holders of preferred shares were to receive and be paid $110 per share plus all accrued and unpaid dividends. The Schiller agreement did not enlarge these rights in any important particular.[7] It fixed a definite date for the liquidation of such of the preferred as desired it and provided for distribution in kind; there was nothing illegal in either of these provisions. The establishment of a date for such liquidation was always within the power of the corporation; the distribution in kind was for the corporation's benefit. Moreover, if these provisions should be considered as an enlargement of preferred rights at the expense of common, the fact that the agreement was approved by a large majority of common shareholders is a conclusive answer—it was within the power of the common shareholders to enlarge the rights of preferred shareholders at their own expense.[8]

But it is urged the agreement is invalid because it provides for payment of dividends on preferred to the date of liquidation irrespective of earnings, and that under our law dividends can only be paid from earnings and not capital. The Act of May 23, 1913, P. L. 336,

----

[7] After providing for distribution on March 1, 1937, the agreement provided: "Such distribution to the said holders of preferred stock shall not exceed $110 per share plus accrued and unpaid dividends to March 1, 1937, in cash and/or Steel common at its closing market value on the New York Stock Exchange as of the close of business on February 28, 1937."

[8] The contract with the common shareholders provided that the company might at any time with the consent of a majority of the holders of common stock "alter or change the rights, privileges, terms and conditions thereof."

expressly forbids payment of dividends in excess of corporate net profits. A long line of cases has established the same principle.[9] Corporate capital cannot thus be depleted while the corporation is a going concern; the corporation is under a strict duty to protect creditors. This rule effectively prevents payment of dividends on any class of stock while the corporation is a going concern unless there be earnings from which such declaration can be made. But with respect to preferred dividends with cumulative features, neither the failure of earnings in any particular year nor the absence of a declaration of such dividends in years when there are earnings will prevent them from accruing, and they are "owing" the holder. When a corporation decides upon a course of liquidation, whether partial or entire, there is no legal prohibition upon the payment of these accumulated preferred dividends irrespective of the presence of earnings, provided the rights of creditors are not impaired. The contract of the preferred shareholders expressly provided that upon dissolution, liquidation, *or upon any distribution of capital assets,* the preferred shares were to receive $110 plus all accrued and unpaid dividends. Where a corporation issuing stock has contracted that upon liquidation a certain class of stockholders shall be preferred as to principal and accumulated dividends, such dividends are payable in full irrespective of the existence of profits.[10] That Pennsylvania recognizes and enforces this rule is evident from the language of the late Chief Justice Frazer in *Branch v. Kaiser,* 291 Pa. 543, 549, where it is stated that, *"With*

---

[9] *Pardee v. Harwood Elec. Co.,* 262 Pa. 68; *Warren v. Queen & Co.,* 240 Pa. 154; *Fidelity Trust Co. v. Lehigh Valley R. R. Co.,* 215 Pa. 610; *Cornell v. Seddinger,* 237 Pa. 389; *Loan Society of Phila. v. Eavenson,* 248 Pa. 407; *Branch v. Kaiser,* 291 Pa. 543.

[10] *Willson v. Laconia Car Co.,* 275 Mass. 435; *Penington v. Commonwealth Hotel Construction Corp.,* supra, note 6; *Hildreth v. Western Realty Co.,* 62 N. D. 233; *Bunker Hill Country Club v. McElhatton,* 282 Ill. App. 221.

*the exception of distributions made in liquidation,* dividends can be declared and paid out of profits only. . . ."[11] (Italics added.) While in these instances, courts were considering cases involving the complete liquidation of the corporation involved, the same principle is applicable where the distribution of capital assets is otherwise legally being made to a portion of the whole body of stockholders so preferred. In *Hildreth v. Western Realty Co.,* 62 N. D. 233, the court stated (p. 246): "If upon liquidation the claim for cumulative dividends extends to the capital assets and is preferred to the claims of the common stockholders, no reason is apparent why *upon a partial distribution of capital assets* the same rule should not apply." (Italics added.)

Of course more caution should be exercised upon a partial liquidation for the reason that if the unliquidated corporate structure should continue its activities, rights of creditors existing at the moment of the partial liquidation may be impaired. But here we are not confronted with any question of the impairment of the rights of creditors, nor could any of them contest the validity of this agreement or the distribution to be made under it. The agreement makes express provision for this situation by seeing to it that out of the proportionate share of the assets distributed a sum sufficient to retire a similar proportion of the debts of the corporation should be returned to it. The remaining liabilities of the corporation are amply secured by the assets remaining in its control.

Concluding that the agreement and the method providing for this liquidating is valid, the agreement provides that distribution should be made of the Steel common as of its value on February 28, 1937. That day being a legal holiday, it was held the stock should be val-

---

[11] See also *Drewry-Hughes Co. v. Throckmorton,* supra, note 6; *Fawkes v. Farm Lands Investment Co.,* 112 Cal. App. 374; *Johnson v. Johnson & Briggs, Inc.,* 138 Va. 487; *Westerfield-Bonte Co. v. Burnett,* 176 Ky. 188.

ued as of February 27, 1937. When the decree nisi was entered this involved no hardship to either preferred or common shareholders, as Steel common was then selling at $112 a share. However, when the matter was argued on exceptions and at the time of the entry of the final decree, the value of Steel common had again depreciated, making it impossible to pay off even the preferred in full. It was therefore argued by the preferred shareholders that they were entitled to either interest or liquidated damages because of the loss which had resulted to them from the breach of the contract. The assignments of error to the final decree and the refusal to award damages are sufficient to enable us to consider that portion of the decree of the court below ordering the Steel common to be valued as of February 27, 1937.

Pendency of the injunction suits to test the legality of the agreement placed United in the position of a stakeholder. It was not at liberty to make a distribution of its assets without acting at its peril: *Diamond v. Lawrence County,* 37 Pa. 353, 356; *Jones v. Securities & Exch. Commission,* 298 U. S. 1, 15; *Merrimack Riv. Sav. Bk. v. City of Clay Center,* 219 U. S. 527; see *Commonwealth v. Kelly,* 322 Pa. 178, 185; 2 Pomeroy, Equity Jurisprudence, section 632. There is no evidence that the suit against it was collusive. While litigation commenced in bad faith cannot shield a party from performance of a contract, bad faith must appear and assuredly United, as a corporation, acting in good faith upon advice of counsel, cannot be penalized for the entry of these suits.

But it is clear a gross injustice will be done if literal compliance with the agreement is now enforced. To value the Steel common as of February 27, 1937, when it is now selling at about $40 a share, would deprive the holders of United preferred of valuable rights. This neither justice nor equity should countenance. Such literal enforcement of the agreement would result in a surplus to be returned to the corporation for the benefit

of its common shareholders and those preferred holders who did not seek the benefit of the agreement.[12] The agreement in fact calls for a proportionate division of the assets of the corporation. The stipulation that Steel common should be valued as of February 28, 1937, was one of convenience. While this is an equitable proceeding for specific performance, where the agreement has been breached and performance prevented by force of law, a chancellor may extend the time to carry forward the full intent and purpose of the agreement. In all cases of specific performance where time is of the essence of the contract, and default is made, equity may enforce performance by extending the time. See *Vittor v. Szymanski*, 321 Pa. 345. The preferred shareholders are not entitled to a sum greater than $110 a share plus all accrued dividends to the date of distribution. To accomplish an equality of result between the preferred shareholders withdrawing from the corporation and those preferred remaining therein, which was the true intent of the agreement, and, at the same time, see that the withdrawing shareholders receive no more than they are entitled to under the contract under which these shares were issued, the decree of the court below should be reformed, so as to have the Steel common valued as of the date of distribution. This will accomplish the proportionate division of assets contemplated by the agreement. The final decree of the court below must be modified. The fifth paragraph of the final decree must be amended to read as follows: "Treating such Steel common as of the value fixed by the New York Stock Exchange at the time distribution is made" and deleting the words "as having a value of $111.25."

---

[12] On the basis of the decree of the court below with Steel common selling at an assumed market value of $100 a share, if the value of February 27, 1937, controlled, the stamped preferred shares would receive $132.96, the unstamped preferred stock could be retired at $147.92 and there would remain with the corporation $1,444,712.64 after retirement of all its indebtedness.

474

With reference to the appeal of a preferred shareholder who did not take advantage of the agreement of March 1, 1932, prior to the date fixed by the trustee, the value of the preferred shares as a class may not be impaired or affected by the Schiller agreement. This agreement could not and did not prejudice the rights of non-consenting preferred shareholders. The consenting preferred shareholders, or those who may be considered parties to the agreement, were those who lodged their certificates with the trustee. These represented by far the great majority of preferred shareholders, but the rights of the non-consenting shares were not thereby infringed. On liquidation the value of their stock stood on the same plane as the consenting shares. While a non-consenting shareholder was without rights under the agreement, the appeal of Helen Jacobs raises the question of her right to participate in the distribution. This involves further a liquidation as it relates to non-consenting shareholders who did not participate in the agreement whose benefits they did not elect to receive. It is urged that since performance of the agreement accomplishes a distribution of capital assets they likewise are entitled to be included in that liquidation. As the agreement calls for a partial liquidation involving more than nine-tenths of its capital assets, such non-consenting shareholders should not be left to the mercy of the common shareholders who have exhibited no particular desire to preserve the integrity of the preferred. Ordinarily this Court would not order liquidation of a corporation against the wishes of the common shareholders. But in the circumstances of this case, under our equitable powers over corporations, we direct that such preferred holders who desire to have their shares liquidated on the same basis as those entitled to under the Schiller agreement may do so.

Decree is modified as herein directed and the record is remitted to the court below to make the distribution herein provided for.