## Peoples-Pittsburgh Trust Company *v.* Pittsburgh United Corporation (et al., Appellants).

## Levin et al. *v.* Pittsburgh United Corporation (et al., Appellants).

108

Argued (Appeal, No. 48, submitted) March 24, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*John J. Heard,* for appellants, Nos. 42 and 43.

*Chas. H. Sachs,* with him *Louis Caplan,* of *Sachs & Caplan,* for appellants, No. 48.

*Charles F. C. Arensberg,* of *Patterson, Crawford, Arensberg & Dunn,* with him *Ella Graubart,* for appellees.

OPINION BY MR. JUSTICE LINN, April 17, 1939:

These appeals are from the denial of counsel fees in proceedings reported as *Levin et al. and Peoples-Pittsburgh Trust Company, Trustee, v. Pittsburgh United Corporation et al.,* 330 Pa. 457, 199 A. 332, two suits which grew out of the sale, in September 1930, by the corporation, for convenience called United, of substantially all its assets for 108,402 shares of common stock of United States Steel Corporation then selling at 155. United had issued and outstanding two kinds of stock: 389,963 shares of common and 58,212 shares of 7% cumulative preferred stock redeemable at 110 and accrued dividends. If United had then converted the Steel stock into cash and used the proceeds to redeem its preferred shares, its treasury would have had remaining a large surplus for the benefit of its common stockholders. When United declined to do this, William B. Schiller and others holding 6,610 shares of preferred stock, on March 14, 1931, filed their bill against United to compel redemption. The plaintiffs in that suit were William B. Schiller, George Harting, George E. Shaw, Maria T. Hunt, Ascalot Company, a Delaware corporation, Jennie King Mellon, Kate J. Reed, Kerfoot W. Daly and Minnie G. Sands and were represented by counsel who now appeal at number 42. In March, 1932, when Steel common was selling at 40, the litigation was settled by a contract called the Schiller agreement. If the proceeds of Steel common at 40 had been applied to the redemption of the preferred stock, the common stockholders would have received nothing. Accordingly, the agreement provided that United should have until March 1, 1937, to pay its debts and redeem the preferred stock. Schiller and his co-plaintiffs became the parties of the first part to the agreement; defendant, United, and Peo-

ples-Pittsburgh Trust Company, as Trustee, became the parties of the second and third parts respectively. For their services in bringing about the Schiller agreement, counsel (present appellants at number 42) were paid by United the sum of $25,000;[1] United's counsel received the same amount.

Toward the end of the five-year period specified in the agreement, holders of common stock instituted suits against United and others to enjoin it from carrying out the Schiller agreement. United informed the trustee that it was advised by counsel that the existence of these suits would prevent compliance with the agreement. To meet that situation, the trustee, on March 6, 1937, filed its bill, in substance, for specific performance and in the course of the litigation was represented by its own counsel. It named as defendants not only United but also a number of holders of preferred stock (the parties of the first part to the Schiller agreement) and the common stockholders who had brought the suits to restrain United from complying with the agreement. The appellants at number 42 accepted service and appeared for preferred stockholder defendants and filed a joint answer on their behalf admitting the averments of fact contained in the bill and joining in the prayers for relief. At the same time, Lillian Levin and William C. McEldowney, holders of preferred stock of United, by counsel now appellants at number 48, filed a bill also asking specific performance. On a petition filed by the same counsel on her behalf, Helen Jacobs, holder of preferred stock not stamped (a term defined later) pursuant to the Schiller agreement, was allowed to intervene; in consequence of that representation, they claim fees as for services to holders of unstamped preferred stock.

---

[1] Par. 15 provided: "All costs, expenses and counsel fees incident to the aforesaid suit and the settlement thereof shall be paid by Pittsburgh United and the same shall not be treated as an operating expense as such term is herein defined."

The two suits for specific performance were tried together. The trustee-plaintiff promptly appealed to this court. In addition, separate appeals were taken by preferred stockholder defendants, represented by the present appellants at number 42, and by the plaintiffs, Levin and McEldowney and the intervener Helen Jacobs, then represented by present appellants in number 48. All the appeals were disposed of in the opinion reported in 330 Pa. 457, 199 A. 332, modifying the decrees appealed from.

It is for the services rendered from the time the Schiller agreement became effective in 1932 until the decision of this court, that appellants at number 42 claim compensation out of the fund available for the retirement of preferred shares. Appellants at number 48, having represented the intervening preferred stockholder, ask compensation for their services on the ground that, by acting for her, they benefited all unstamped preferred stock. The learned court below dismissed the first claim on the ground that claimants had not brought themselves within the rule authorizing the allowance of fees; the second was dismissed on other grounds which need not be separately dealt with as we all agree that both claims fail for the same reason. Counsel for the trustee, in opposing the claims, not only do not suggest that the services for which the claims are made were not valuable but, on the contrary, concede the fact.

The Schiller agreement imposed active duties of importance on the trustee and specifically authorized it to employ and to compensate counsel. Its counsel prepared the bill and conducted the litigation from beginning to end. Appellants' brief states that "At the trial the burden was assumed by the Trustee's counsel." Both claimants also participated, one appearing for preferred shareholders named as defendants, and the other for Levin, McEldowney and Jacobs, but neither gave notice[2] to the trustee that they would ask for compensa-

---

[2] Cf. *Central R. R. v. Pettus,* 113 U. S. 116, 120.

tion out of the fund available for the redemption of the preferred stock. On the contrary, there is evidence that makes strongly against the first appellants. "Q. Did you or anyone else make a suggestion at any time that you enter your appearance or your firm's appearance in connection with the trustee's Specific Performance proceeding? A. Yes; I talked to Mr. Arensberg [counsel for the trustee] about it and I had the impression he was not adverse to it but of course, he said he had to put it up to his clients and he told me the next day they did not wish to have it done. Q. Did he say why? A. I don't remember that he did, but I had the impression—I don't know whether I got it in his words or others—I had the impression they did not want to cause unnecessary friction with Mr. Hillman. . . ."

When the petitions for counsel fees were presented, a rule was granted on all parties of record and on all holders of preferred stock to show cause why the prayers of the petitions should not be granted; service by mail and by publication was also directed. A number of preferred stockholders filed objections; appellants state that "about 4% of the preferred shareholders owning less than 7% of the preferred objected to the payment."

The general rule is that a trust estate must bear the expense of its administration and the cases show that when a claim for counsel fees is made it must appear that the services for which fees are claimed were necessary; incidental benefit to *cestuis* is insufficient. Our cases illustrate this in a variety of circumstances. In *Com. v. City Trust, etc., Co.*, 38 Pa. Superior Ct. 536, counsel for creditors of an insolvent corporation who succeeded in reducing fees claimed by the auditors and the receiver and thereby increased the dividends payable to creditors, were held not to be entitled to compensation out of the fund. The court said (page 539) "Where an attorney secures a fund, which would otherwise have been lost, it would be both just and equitable that the counsel recovering the fund should receive compensation,

but in this case there was no allegation of malfeasance on the part of the receiver or the auditors, nor was any fund recovered by reason of the services of the appellants."

In *Com. ex rel. v. Order of Solon,* 193 Pa. 240, counsel succeeded in having unfounded claims rejected but was held not entitled to fees out of the fund. DEAN, J., said: "But, it is urged, that Mr. Quincy, from his argument, and some evidence produced by him, induced the auditors to reject many thousand dollars of spurious claims on the fund, and thereby all holders of certificates, whether purchased by or originally issued to them, were benefited. Admit it; but he did only what he was bound to do under his professional obligation to his own clients; if he had done less, he would have failed in duty to them; in this particular he owed no duty to other claimants and performed none to them, although an incidental benefit may have resulted to them from the performance of a duty to his own clients. This, however, gives him no claim on them for contribution to his compensation. Suppose, as there might easily have been from the large number of claimants, thirty lawyers representing thirty separate claims, and fifty unrepresented certificate holders before the auditors, and every lawyer had urged successfully a point which induced the rejection of some unfounded claim, then compensation to each, at the rate here allowed, would have swept away the whole fund. That this claim being only for one lawyer, in no degree under the facts raises an equity in his favor. It would have been otherwise if the fund in the beginning had been raised or saved by him as counsel for his particular clients" (pp. 243-244).

In *Hempstead et al. v. Meadville Theological School,* 286 Pa. 493, 497, 134 A. 103, in which fees were denied, we said: "Generally these cases have held that where many persons have a common interest in a trust property or fund, and one of them, for the benefit of all, at his own cost and expense, brings suit for its preserva-

tion or administration, the court of equity in which suit is brought will order plaintiff to be reimbursed his costs and expenses, including counsel fees, from the property of the trust, or order those benefited to contribute proportionately toward that expense."

In *Harrison's Estate*, 221 Pa. 508, at 510, 70 A. 827, it was said: "The fund was in the hands of the court, and in no jeopardy except from possible mistake of the court in dealing with it; and in that event nothing more was required for the correction of the error than the filing and argument of proper exceptions in the court below, and, if necessary, following the matter to the appellate court. There is no evidence that anything out of the ordinary routine of legal procedure was required. The appellant was protecting her own interest, and although it may be that by means of her efforts others were benefited also, yet we know of no rule of law which will entitle her to be reimbursed for payment of counsel fees expended by her in order to protect her own interest. The services she rendered to the common interest were voluntary, and however beneficial they may have been, no legal charge for them can be sustained, in the absence of a contract of employment, either expressly made or superimposed as a matter of law or equity upon the facts."

In *Evans v. Diamond Alkali Co.*, 315 Pa. 335, 172 A. 678, fees were denied to counsel for a stockholder on the ground that the fund restored to the corporation and sought to be charged, was obtained by corporate action and not by the stockholder's complaints which induced the action. The general rule was applied in two very recent cases; among the appeals disposed of in *Mortgage Building & Loan Association Case*, 334 Pa. 81, it appeared that counsel representing himself and two clients, claimed compensation "for services of unusual and special necessity and fundamental importance thrown upon [him] . . . and which were a benefit to all interested in the estate." The court below found that he had "rendered no services in this matter other than those on be-

half of the three claimants whom he represented . . ." one being himself. His claim was rejected. See also *Wilbur's Estate*, 334 Pa. 45. The record does not show that a fund was rescued from the consequences of a trustee's neglect *(Trustees v. Greenough,* 105 U. S. 527) or was recovered from parties in unlawful possession *(U. S. v. Equitable Trust Co.,* 283 U. S. 738) or was created by establishing an equitable lien on property conveyed in fraud of creditors *(Central R. R. v. Pettus,* 113 U. S. 116) cases in which fees are allowed. See also *Harris's Appeal,* 323 Pa. 124, 186 A. 92; *Crawford's Estate,* 307 Pa. 102, 160 A. 585; *Miller v. Myers,* 300 Pa. 192, 150 A. 588; *Weed's Estate,* 163 Pa. 600, 30 A. 278; *Manderson's Appeal,* 113 Pa. 631, 6 A. 893; *Sterrett's Appeal,* 108 Pa. 615. The bankruptcy cases cited in the brief are not in point because section 77B (c) (9) conferred a wide discretion on the judge *(In re Paramount Publix Corporation,* 85 F. (2d) 588) and established a different rule than generally applied in equity.

A brief examination of the relations between United, its shareholders and the trustee, as affected by the Schiller agreement, will disclose the conditions to which the rule must be applied.

United had ceased doing the business it was incorporated to transact;[3] little remained except to liquidate;

---

[3] The agreement provided: "Fourth. Pittsburgh United agrees that during the operative period of this agreement, it will confine its activities to such as are necessarily incident to the carrying out of this agreement, will engage in no other business or undertaking and will limit and restrict its operating expenses (exclusive of taxes, interest on its Funded Debt, the compensation and expense of the Trustee hereunder, extraordinary legal expense, if any, and fees of its transfer agents and registrars), so that the same shall not exceed $15,000.00 per annum. Pittsburgh United further agrees that during said period it will create no indebtedness and incur no obligation except (1) such indebtedness as shall be incident to the refunding of Funded Debt in accordance with the provisions of Sub-division (4) of Article First hereof and (2) Current Indebtedness, which shall be limited to taxes, interest up-

the higher the price of Steel common the better the liquidation. The preferred shareholders were interested in the protection of their superior hold on the corporate assets from impairment by efforts of the common stockholders to improve theirs by delaying liquidation in the hope of a rise in the price of the Steel stock. The preferred holders' superior position was originally created by the Articles of Incorporation,[4] not by the Schiller agreement, which, except as to those agreeing otherwise, could not diminish the rights originally vested in them; these could only be affected by charter amendment; nonassenting preferred stockholders were entitled to insist

on the Funded Debt, the Trustee's compensation and expense, extraordinary legal expense, if any, fees of its transfer agents and registrars and operating expenses which operating expenses shall not exceed said amount of $15,000.00 per annum."

The agreement set forth that aside from its franchise and treasury stock, United's assets consisted of 108,402 shares Steel common, and as of December 31, 1931, cash $178,713.14; that "(2) With the exception of its liability to its stockholders, preferred and common, and its current obligations for interest, taxes and operating expenses, which, as and when due and payable, can readily be and will be paid out of its cash on hand, its known liabilities aggregate $1,040,000.00, represented by bills payable."

[4] ". . . 4. The Preferred Stock shall be redeemable, either as a whole or in part, on any dividend payment date, at the option of the Board of Directors of the Company, upon notice given as hereinafter provided, at $110 per share, plus all accrued and unpaid dividends thereon to the date of the redemption thereof. In case the Company shall at any time elect to redeem and retire less than the whole of its outstanding Preferred Stock it shall either (A) select by lot in such manner as its Board of Directors shall determine the shares to be redeemed and retired, or (B) redeem and retire such proportion of such Preferred Stock held by each holder thereof, as the aggregate par amount of such Preferred Stock then to be redeemed and retired shall bear to the total par amount of such Preferred Stock then outstanding; . . ." It may be noted that not all of the preferred stockholders had accepted the Schiller agreement.

on their rights.[5]  The preferred shareholders who submitted their certificates for stamping[6] limited their formerly existing rights; those who did not have the certificates stamped retained all the rights originally vested; they had not subordinated their shares and for that reason were made beneficiaries by the decree of this court: 330 Pa. 457, 474.

The trustee, as has been said, had active duties to perform: among other provisions on the subject the following appears in the agreement: "Promptly following the close of business on February 16, 1937, the Trustee shall take or cause to be taken every action necessary or proper in order that the provisions of subdivision (2) [relating

---

[5] See section 3 of the Act of May 25, 1921, P. L. 1159, 15 PS section 164, supplied by section 601 of the Act of 1933, P. L. 364, 15 PS section 2852-601.

[6] "TENTH. It is the purpose of this agreement and the intention of the parties hereto that each holder of shares of preferred stock of Pittsburgh United shall be afforded an opportunity to have his preferred shares retired on March 1, 1937, at the liquidating value thereof in accordance with the succeeding provisions hereof . . . Every holder of shares of preferred stock who shall desire to have his shares retired on March 1, 1937, shall, on or within ninety (90) days prior to February 10, 1937, present, or cause to be presented to the Trustee at its principal office in Pittsburgh, Pennsylvania, the certificate or certificates for such shares, and the Trustee shall thereupon stamp such certificate or certificates with a notice to the effect that the shares represented thereby are to be retired on March 1, 1937, and the shares of stock represented by any certificate so stamped shall not after such stamping be subject to transfer on the books of Pittsburgh United.  Each and every holder of shares of preferred stock who shall not present, or cause to be presented, to the Trustee at its said office, the certificate or certificates for such shares on or within ninety days prior to February 10, 1937, for retirement as aforesaid, shall be deemed to have elected to retain such shares and waive any and all benefits accruing to the said holder of said shares of preferred stock under this Agreement and both Pittsburgh United and the Trustee from and after February 10, 1937, shall be released from all further liability to such holder hereunder."  See 330 Pa. at 462-463, 199 A. 332.

to distribution of assets] of Article Tenth hereof shall be fully and punctually complied with and the holders of shares of preferred stock who in accordance with the provisions of said Article Tenth have elected to have their shares of preferred stock retired on March 1, 1937, may receive the price therefor in the manner and at the time specified in said subdivision (2) of Article Tenth hereof." It is therefore unimportant, in disposing of these appeals, that one set of appellants represented holders of stamped and the other of unstamped certificates. The fund for redemption resulting from the conversion of the Steel common at the prevailing market price was not sufficient to redeem all the Preferred Shares on the terms stated in the certificates, and as it was not proposed to distribute to less than all, in the manner allowed by the certificates, it became essential to treat all alike.

The trustee, by its own counsel, the employment of which, at the expense of the trust, was authorized by the agreement, promptly filed its bill to obtain performance of the agreement to retire the preferred stock. If the trustee had refused or neglected to proceed and had made action by appellants' clients necessary to enforce the agreement, appellants would have brought themselves within the rule charging the value of their services on the fund.[7] But there is no suggestion that the trustee failed in any respect to perform any duty imposed on it by the trust or otherwise. The sufficiency of its bill in equity and the competency of its counsel are conceded by appellants.[8] Some of the property was in

---

[7] Compare *Evans v. Diamond Alkali Co.,* 315 Pa. 335, 172 A. 678; *Wilson v. Brown,* 269 Pa. 225, 112 A. 1; *Passmore v. Allentown etc. Co.,* 267 Pa. 356, 110 A. 240.

[8] One of them testified: "But, I have always had great confidence in Mr. Arensberg [trustee's counsel] and I found, as soon as I got in contact with him, that it did not matter what Mr. Hillman's particular position was and believing the trustee was

the possession of the trustee and the rest was potentially within its grasp; it was a condition which directly resulted from the Schiller agreement for the achievement of which appellants had been paid. There is evidence that appellants rendered service to preferred stockholders during the five-year period following the execution of the agreement but, in the circumstances, compensation is not payable out of the fund but by the parties to whom the service was rendered. After that agreement came into effect, it was unnecessary to procure the restoration of any trust property because none had been diverted; none was in jeopardy. The trustee had not omitted to do anything required to be done by it. By its suit, the property and affairs of United were brought under the control of the court. The trustee necessarily brought in as defendants the other parties to the agreement, preferred stockholders, parties of the first part, and United, of the second part. As we understand it, when the cases were tried, holders of 53,254 shares of preferred stock had had their certificates stamped, leaving 4,958 shares unstamped.[9] Holders of unstamped shares were affected by the intervention of Helen Jacobs; it is immaterial, for present purposes, whether such shareholders were plainitffs or defendants; the fact is that sufficient parties were brought on the record to support the decree for the retirement of all the preferred stock. It is clear that the record shows no necessity for supplementing, at the expense of the fund, the services of the

going to carry this through vigilantly, that satisfied me, and he did do so. He worked rapidly and hard and well in preparing a bill for Specific Performance, in which the trustee was plaintiff and everybody else was defendant. He filed that bill in less than a week after the agreement was violated and I felt the stockholders were being well looked after and it never occurred to me to file any bill for the stockholders as a class, or any particular stockholders."

[9] It appears by stipulation that all but 145 shares had been stamped by March 1, 1938.

trustee's counsel by the service of other counsel whether acting, in the one case, for defendant holders of stamped preferred stock or, in the other, for the intervening holders of unstamped certificates. The appellants brought no property under the control of the court which was not already there as the result of the trustee's act. In the argument it is said that appellants appeared for a class, but that is not enough to bring them within the rule applied in cases cited, because the record shows that the trustee's proceeding was in all respects adequate.

The orders appealed from are affirmed, costs of the appeals to be paid out of the fund for distribution.