In 1930, Oil-Well Supply Company, which had been incorporated to manufacture and sell oil-well supplies and equipment, sold all its property to United States Steel Corporation for 108,402 shares of the common stock of that corporation. The Oil-Well Supply Company then changed its corporate name to Pittsburgh United Corporation. At that time United had outstanding two classes of stock, 389,963 shares of common and 58,212 shares of preferred. The preferred shareholders were entitled to dividends not exceeding 7% per annum. The certificate also contained a provision that "Upon the dissolution, whether voluntary or involuntary, of the Company or upon its liquidation otherwise, . . . the holders of the Preferred Stock shall be entitled to receive and be paid $110 for each share of such Preferred Stock held by them plus all accrued and unpaid dividends thereon before any amount shall be paid to and for the account of the Common Stock." It was also provided that the preferred stock might be redeemed in whole or in part at the option of the directors "at $110 per share, plus all accrued and unpaid dividends thereon to the date of redemption thereof". *Page 330 
At the time of delivery, September 30, 1930, steel common was selling at $155.50 per share, making the market value of the stock received $16,856,511.00. If the preferred stock had then been retired at $110, there would have remained for distribution to the common stockholders, after paying all debts, the sum of $23.74 per share. Preferred shareholders made unsuccessful efforts to induce United to redeem the preferred stock, until, in March, 1931, when steel common was selling at $144.50, a number of preferred shareholders, including William B. Schiller, filed a bill in the common pleas of Allegheny County to compel United to redeem. The suit was settled early in 1932 by an agreement known as the Schiller agreement. By that time, the price of steel common had fallen to 30 1/8 at which, if redemption had taken place, the preferred shareholders would have received only about $40 per share and the common shareholders Would have received nothing. In the hope that the market would improve, the parties agreed that a period of five years should elapse before redemption and that on March 1, 1937, the preferred stock should be redeemed. Peoples-Pittsburgh Trust Company was named trustee in that agreement.[1] On March 6, 1937, in consequence of suits against United to enjoin performance of its agreement to redeem, a bill was filed by the Peoples-Pittsburgh Trust Company, as trustee under the agreement, praying for specific performance by United. The case was heard and the chancellor in July, 1937, when steel common was selling at $113 5/8 decreed specific performance by a decree from which a number of appeals were taken. The decree was affirmed May 9, 1938, with the modification noted in the report of the case at 330 Pa. 457.
October 26, 1938, the trustee filed its first and partial account of its acts to October 21, 1938. Thereafter, on *Page 331 
April 12, 1939, United filed a petition stating that all its assets, excepting $135.89 remaining on hand October 21, 1938, had been delivered to the trustee and that a statement of its liabilities, as of September 30, 1938, was attached to the account as Schedule E. The petition averred that the liabilities had been "sanctioned by the Schiller Agreement and approved by resolution adopted by petitioner's Board of Directors and by them ordered to be paid". Parties, whose preferred shares were by the decree ordered to be redeemed, filed exceptions to the allowance of claims for counsel fees, salaries, etc., accruing after March 1, 1937.[2] An answer was filed by the trustee and evidence was taken. The Schiller agreement, in its 4th paragraph provided:
"FOURTH. Pittsburgh United agrees that during the operative period of this agreement, it will confine its activities to such as are necessarily incident to the carrying out of this agreement, will engage in no other business or undertaking and will limit and restrict its operating expenses (exclusive of taxes, interest on its Funded Debt, the compensation and expense of the Trustee hereunder, extraordinary legal expense, if any, and fees of its transfer agents and registrars), so that the same shall not exceed $15,000.00 per annum. Pittsburgh United further agrees that during said period it will create no indebtedness and incur no obligation except (1) such indebtedness as shall be incident to the refunding of Funded Debt in accordance with the provisions of Subdivision (4) of Article First hereof and (2) Current *Page 332 
Indebtedness, which shall be limited to taxes, interest upon the Funded Debt, the Trustee's compensation and expense, extraordinary legal expense, if any, fees of its transfer agents and registrars and operating expenses which operating expenses shall not exceed said amount of $15,000.00 per annum."
In passing on the exceptions, the learned court below held that the claimed salaries and expenses accruing after March 1 were not payable out of the redemption assets in the hands of the trustee. The claimants appeal. The claims of creditors which arose prior to March 1, 1937, were provided for in the Schiller agreement and are not in dispute. The present controversy is between holders of stamped certificates and parties becoming creditors after the redemption date.
1. The important fact in this case is that on March 1, the date on which United was obligated to redeem its preferred shares, its assets were sufficient to pay all the then existing liabilities of the company, to redeem all the preferred shares, and to leave something for the common stockholders.[3] By that date certificates for 53,254 shares of preferred stock had been stamped for redemption, and were therefore redeemable on that date, with the result that thereafter the holders of the stamped certificates were subject to the terms of the Schiller agreement for their rights and not to the terms contained in their stock certificates as they existed before stamping; they no longer had a stockholder's right to future dividends, or to participate in assets on dissolution, or to vote. The Schiller agreement provided "and the shares of stock represented by any certificate so stamped shall not after such stamping be subject to transfer on the books of" United. By March 1, 1937, therefore, they had ceased to be shareholders and had become creditors entitled to receive a sum calculated according *Page 333 
to the terms of the agreement. The decree for specific performance determined that this agreement was valid and binding on the corporation. It is that obligation which the learned court below refused to disturb by now charging with liabilities accruing after the date of redemption provided in the Schiller agreement, the trust res set apart by a solvent corporation to create the redemption fund.
2. Appellants assert that a corporation may not redeem capital stock if the redemption deprives creditors of assets to which they would otherwise have recourse. There is no doubt of the validity of that proposition. Section 705 of the Corporation Law of 1933, P. L. 364, 15 PS section 2852-705, provides that "No redemption of shares shall be made which will reduce the remaining assets of the corporation below an amount sufficient to pay all debts and known liabilities of the corporation as they mature, except such debts and liabilities as have been otherwise adequately provided for. . . ." Did the agreement for the redemption of the preferred shares on March 1, 1937, leave assets "sufficient to pay all debts and known liabilities of the corporation as they mature, except such debts and liabilities as have been otherwise adequately provided for"? Would performance of the agreement on March 1st have left the corporation solvent? If it would, and there is no doubt of that fact, there was no breach of the statute and appellants can take nothing by their appeals. On March 1, 1937, United held 108,402 shares of steel common then selling at $114 7/8, or assets having a market value of $12,452,679; its liabilities, including an estimate of $250,000 "to cover expenditures which, by the 4th paragraph of the Schiller agreement, [the trustee] is authorized to make in the execution of its trust", were $1,634,273, leaving net assets of $10,818,406. To redeem the 53,254 stamped shares at $110 and dividends, i. e., $147.91 2/3, would require $7,877,154, leaving $2,941,252 in the treasury of United after allowing for all known debts as well as *Page 334 
those contingent under the Schiller agreement. If all of the preferred shares (58,212) had then been redeemed, there would still have been left net assets of $2,207,881 available to the common stockholders.
3. By the Schiller agreement, a trust res consisting of so much of the proceeds of the sale of steel common as should be necessary to redeem the stamped preferred stock had been provided. United was a party to the agreement,[4] and, as a solvent corporation, was competent to make it. Our attention has not been directed to anything in the record that would throw on the trust res the risk of decline in market value of the equity remaining in United for general corporate purposes. The appellants rely on Warren v. Queen Co., 240 Pa. 154. That was an action of assumpsit brought on the obligation contained in a stock certificate that the "shares represented by this certificate shall be redeemed by the Company on March 1, 1911, at par." The issue was made by the affidavit of defense which denied that the company had money or property to make the redemption "without injustice to the existing rights of creditors and other stockholders, or without depriving the corporation of funds, property and revenues necessary to the usual current and proper business of the company." It was held that plaintiff was not entitled to summary judgment; that the stock certificate was not an instrument in writing for the payment of money and that "the holder of such certificate cannot recover the principal of the stock until the indebtedness of the corporation is liquidated." *Page 335 
There is no doubt of the validity of that decision, but it is obvious from the facts in the present record that the questions now for decision are altogether different. By March 1, 1937, the certificates, stamped by the trustee under the Schiller agreement, dropped out of the transaction and for the rights theretofore enjoyed by them as certificate holders, they were relegated to their rights under that agreement. The decree for specific performance determined that they had become creditors. Their claim was therefore not subject to the objection sustained in Warren v. Queen Co., 240 Pa. 154, which was that shareholders could not be paid without sacrificing rights of creditors; on the contrary the payment of prior creditors was specifically provided for in the Schiller agreement itself and when the obligation matured in 1937 there were ample assets to pay all creditors. We are not dealing with rights of creditors in an insolvency proceeding but with distribution of a trust res created by a solvent corporation for the benefit of a particular class of creditors who, by the decree, became judgment creditors. If a corporation has performed its promise to redeem and has actually cancelled shares in circumstances in which existing creditors are not prejudiced, a subsequent creditor will not be heard to complain: Mannington v. HockingValley Ry., 183 F. 133, 146 (S.D. Ohio, 1910); compare Vroomanv. Vansant Lumber Co., 215 Pa. 75, 64 A. 394; Wolf v. Excelsioretc. Co., 270 Pa. 547, 113 A. 569; Illoway v. Daly, 65 Pa. Super. 333; Gehret v. Mitten Bank etc., 120 Pa. Super. 198, 182 A. 125; see Wolff v. Heidritter Lumber Co.,112 N.J. Eq. 34, 163 A. 140 (1932). In Campbell v. Grant TrustCompany, 97 Ind. App. 169, 182 N.E. 267 (1932), it was held that a preferred shareholder who takes the company's promissory note in redemption of his share becomes a corporate creditor and shares with other creditors in insolvency proceedings. And after a dividend is declared, the stockholder *Page 336 
becomes a creditor in that amount: Bryan v. Welch,74 F.2d 964, 970-971 (C.C.A. 10th, 1935); West Chester Etc. R. R. v.Jackson, 77 Pa. 321.
4. The stamped certificate holders therefore had, on March 1, 1937, a claim on the assets held by the trustee which was prior to the claims of subsequent creditors. On May 9, 1938, this court, in modifying the decree of specific performance, held that preferred shareholders whose certificates had remained unstamped should be allowed redemption on a parity with the holders of stamped certificates. It might be argued that although the claims of appellants are subsequent to the shareholders whose certificates were stamped on March 1, 1937, they are prior to the claims of these holders of unstamped shares who were allowed to participate only by the decree of May 9, 1938. In other words, it might be reasonably contended that the order of preference would be as follows: (1) holders of the certificates stamped prior to March 1, 1937; (2) creditors whose claims arose between March 1, 1937, and May 9, 1938; (3) holders of the unstamped certificates; and (4) common shareholders. Appellants, however, are not in a position to complain of the opportunity to participate granted to the holders of the unstamped certificates, for the market value of the shares of steel common held by the trustee has been, since the affirmance of the decree for specific performance, insufficient to allow payment in full even to the holders of the 53,254 originally stamped preferred shares at the redemption price to which they were entitled. The fact that preferred shareholders who had not originally submitted their certificates for stamping were subsequently given leave to have them stamped after March 1st is of no consequence to appellants because nothing is taken from them which they would otherwise have received. The amount distributable to shareholders who subsequently had their certificates stamped may take from what, under a strict construction of the agreement, would have been payable *Page 337 
to the shareholders whose certificates were stamped prior to March 1st, but they have not complained. Nothing has been taken from appellants by the decree because they could receive nothing in distribution until, at least, the holders of the originally stamped preferred shares, the first class mentioned above, received the full amount distributable to them under the contract, and that they will never receive because of the decline in the price of the steel common.
The order appealed from is affirmed, costs to be paid out of the fund remaining for distribution.
[1] The terms of the trust were considered in Levin v. PittsburghUnited Corp., 330 Pa. 457 and 334 Pa. 107.
[2] The exceptions were to "a. The charge of Hillman Coal Coke Company . . . for unpaid office expenses. . . . b. The charge of Alter, Wright Barron and Thomas Watson, Esqrs., . . . for legal services rendered Pittsburgh United Corporation, . . . c. The charge of A. C. Robinson, a separate defendant in Pittsburgh United Corporation litigation, for . . . [counsel fees paid by him]. d. The claims of . . . the President, . . . Vice President and Treasurer, and of . . . the Secretary [of United for salaries]."
[3] It may be noted that this was also the fact in July, 1937, when the decree for specific performance was made.
[4] Incidentally it may be noted that most of the appellants participated in making the agreement and all, during the time their claims accrued, had full knowledge of the preferred position conferred by the agreement on those who held preferred shares, and of the fact that, in the contingency specified in the agreement, they would on that day become creditors of United with specified property vested in Peoples-Pittsburgh Trust Company, trustee, as security for the payment of their claims for the redemption value.