**In re: TRUST OF Henry Orth HIRT, Settlor, Trust under Agreement Restated December 22, 1980.**

**Appeal of: Laurel Ann Hirt, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 2003.

Filed Aug. 7, 2003.

Reargument Denied Oct. 16, 2003.

*John T. Brooks*, Chicago, IL, for appellant.

*Wendy E. Long*, Philadelphia, for F.W. Hirt, appellee.

*Lawrence G. McMichael*, Philadelphia, for Susan Hirt Hagen, appellee.

BEFORE: TODD, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Laurel Ann Hirt, asks us to review the order entered in the Erie County Court of Common Pleas, which construed the Trust Agreement of Henry Orth Hirt ("Trust") so that Appellees, the trustees of the Trust ("Trustees"), could implement a funding proposal and voting trust agreement in order to provide a mechanism for payment of expenses generated by the Trust.[1] Appellant avers that

---

**1.** Appellee/trustee/beneficiary S.H. Hagen is the only daughter of H.O. Hirt, and Appellee/trustee/beneficiary F.W. Hirt is the only son of H.O. Hirt. Appellee Banker's Trust Company is the current corporate trustee of the Trust. Appellant is the granddaughter of H.O. Hirt, daughter of Appellee F.W. Hirt, and niece of Appellee S.H. Hagen.

the trial court acted beyond the scope of permissible trust construction when it adopted the Trustees' funding proposal. Appellant further asserts that the funding proposal adopted by the court directly violates the Trust's primary purpose of maintaining unified family control of the Erie Indemnity Company ("Company"). We hold that the trial court's construction of the Trust is a sound reflection of the Settlor's intent under the circumstances of this case. The Trust can be read to allow the adoption of the funding proposal, which solves the problem of the Trust's excess expenses while advancing the Trust's primary purpose of preserving within the Hirt family the unified and centralized control of the Erie Indemnity Company. Accordingly, we affirm the order of the trial court that construed the Hirt Trust to allow implementation of the Trustees' funding proposal and voting trust agreement.

¶ 2 The relevant facts and procedural history of this appeal are accurately set forth in numbered paragraphs in the trial court opinion, as follows:

*Creation of H.O. Hirt Trusts*

1. Henry Orth Hirt ("Settlor") created a revocable *inter vivos* trust by agreement dated April 7, 1967, which, as finally amended and restated on December 22, 1980 (the "Hirt Trust Agreement"), became irrevocable when Settlor died on June 19, 1982.

\* \* \*

2. The Settlor co-founded the Erie Indemnity Company, a Pennsylvania corporation (the "Company") in 1925 to serve as the attorney-in-fact for the Erie Insurance Exchange, an unincorporated Pennsylvania reciprocal insurance exchange that the Settlor also co-founded in 1925.

3. At the death of H.O. Hirt in 1982, he owned a controlling interest in the Company, which today consists of 2,340 shares (76.22%) of the Company's Class B voting common stock.

4. The common stock of the Company is divided into two classes, Class B voting common shares ("Class B Shares") and Class A non-voting common stock ("Class A Shares"). Each Class B share is convertible by its owner into shares of Class A stock at a ratio determined from time to time by the Company (currently 2,400 Class A Shares for each Class B Share).

5. During his lifetime, the Settlor transferred assets to the trust governed by the Hirt Trust Agreement, including approximately 50% of the Company's Class A Shares and the controlling interest in the Company's Class B Shares, currently 76.22%.

(Trial Court Opinion, dated May 17, 2002, at 1–2). In pertinent part, the terms of the Trust provide:

*Trust Terms*

6. Article III of the Hirt Trust Agreement governs the administration of the H.O. Hirt Trusts after Settlor's death. Subparagraph 3.01(A) of the Hirt Trust Agreement provides for the creation of two trusts as of Settlor's death, one for each of his children, Susan Hirt Hagen [ ("S.H.Hagen") ] and F. William Hirt ("F.W.Hirt").[2] These two trusts currently are the only trusts administered pursuant to the Hirt Trust Agreement. [Appellees] Mrs. Hagen,

---

**2.** These two trusts are both governed by the same H.O. Hirt Trust Agreement, and currently contain an identical amount of principal (1,170 shares of Class B stock each). For purposes of simplicity, we refer to both trusts collectively, and the trust agreement itself, as "the Trust."

F.W. Hirt and Bankers Trust Company of New York ("Bankers Trust Company") now are acting as Trustees of each such trust (together with their successors, the "Trustees").

7. Pursuant to subparagraph 3.01(A)(1) of the Hirt Trust Agreement, the Trustees are required to distribute all of the income of a Hirt Trust to the child of H.O. Hirt for whom the trust was created and, in addition, the corporate trustee has the discretion to distribute trust principal, other than the Class B Shares, to such child and his or her family for their welfare and comfortable support. The child of H.O. Hirt also has a lifetime right to withdraw any or all of the principal of his or her Hirt Trust, exclusive of the Class B Shares.

8. Upon the death of the child of H.O. Hirt for whom the trust was created, the then remaining trust property, exclusive of the Class B Shares, will be distributed to such persons or entities as such child appoints in his or her will. Subparagraph 3.01(A)(2) of the Hirt Trust Agreement provides that the Class B Shares, together with any trust property not so appointed by the child, will be held in trust for the benefit of the child's spouse unless the child directs otherwise, and upon such spouse's death, or earlier if so directed by the child, will be divided into separate trusts for the benefit of the child's living children and living descendants of any deceased child.

(Trial Court Opinion at 2). The Trust instructs the corporate trustee to perform the following duties:

As among the Trustees, the corporate Trustee shall perform all ministerial and administrative duties, including the keeping of books and records, acting as custodian of the trust property and preparing all necessary tax returns.

(H.O. Hirt Trust, dated December 22, 1980, at 9). The trial court continues to explain the terms of the Trust as follows:

11. Subparagraph 4.03(B) of the Hirt Trust Agreement states that:

The Settlor hereby declares that the purpose of this Trust is to create and preserve unified ownership and control of ERIE INDEMNITY COMPANY as a means of preserving the existence of ERIE INSURANCE EXCHANGE and ERIE INDEMNITY COMPANY as viable entities capable of furnishing insurance to subscribers at the Exchange and employment to loyal employees of the Exchange and the Company. The Settlor further declares that in his experience in the insurance business over half a century, including the Great Depression of the 1930's, World War II, the Korean and Vietnam wars and several recessions, he has never lost sight of the fact that ERIE INSURANCE EXCHANGE, as a reciprocal insurer, was organized and exists primarily for the benefit of its subscribers or policyholders and that therefore the interests of the people who put their trust in the Exchange for the protection of their personal business affairs must come first. However, when the Exchange is healthy, its managing attorney-in-fact, ERIE INDEMNITY COMPANY, will necessarily be prosperous and healthy, to the benefit of the stockholders of the latter. The Settlor therefore urges that the Trustees familiarize themselves with the nature of reciprocal insurers in general and the ERIE INSURANCE EXCHANGE in particular; that in the discharge of their trust duties they concentrate, in cooperation with the Board of Directors of

ERIE INDEMNITY COMPANY and the individual whom the Board designates from time to time as "Manager" of the Exchange and Company, to keep ERIE INSURANCE EXCHANGE in the best of health; and that only when the task proves impossible shall they consider what then appears to them to be a logical change to prevent deterioration and possible disaster to the interests of all concerned.

12. Subparagraph 4.03(C) of the Hirt Trust Agreement states, in part, that:

The Trustees will therefore maintain and preserve ownership of all shares of class B capital stock of ERIE INDEMNITY COMPANY unless and until they shall determine, subject to the specific provisions of paragraph 4.04, that the sale, exchange in a corporate combination or reorganization, or other disposition by the Trust of such ownership will best serve said purpose, in which event they are authorized to sell, exchange in a corporate combination or reorganization, or otherwise dispose of the ownership of all, but not less than all, of said shares, for whatever consideration and upon whatever terms they may determine.

13. Paragraph 4.04 of the Hirt Trust Agreement states, in part, that:

[I]n the exercise of the power and authority to sell, exchange in a corporate combination or reorganization, or otherwise dispose of shares of ERIE INDEMNITY COMPANY granted in paragraph 4.01, or in the taking of any action to terminate the trust or to distribute any part of the corpus to either individual Trustee as a beneficiary other than pursuant to withdrawal as stated in paragraph 3.01(A)(1), the affirmative vote of the corporate Trustee shall be required, and the affirmative or negative vote of either or both of the individual Trustees, although constituting a majority, shall not be sufficient to authorize any such action.

14. Paragraph 4.05 of the Hirt Trust Agreement states that:

The corporate Trustee shall be entitled to receive annual compensation for its services hereunder in accordance with its schedule in effect when the services are performed, but not in excess of such compensation as would be approved by a court of competent jurisdiction. During the Settlor's lifetime such compensation shall be charged wholly against income, unless the Settlor directs otherwise in writing. For any services performed by it in connection with the Settlor's estate, which services are normally performed by the personal representative, the corporate Trustee shall be entitled to such additional compensation as may be fair and reasonable under the circumstances, not to exceed seventy-five (75%) percent of the additional compensation to which it would be entitled as Executor if the assets of this Trust Estate were to be superimposed upon the testamentary estate of the Settlor. The corporate Trustee is authorized in its discretion to sell securities to the extent necessary to pay any portion of such compensation which is chargeable against principle. The individual Trustees shall also be entitled to reasonable compensation for their services hereunder.

\* \* \*

16. No other provision of the Hirt Trust Agreement addresses the payment of the corporate trustee's compen-

sation and proper trust administration expenses from the H.O. Hirt Trusts.

\* \* \*

18. Paragraph 4.05 of the Hirt Trust Agreement also provides that, during the Settlor's life, the corporate trustee's compensation shall be charged wholly against income, unless the Settlor directs otherwise. The Hirt Trust Agreement lacks provisions for the apportionment of the corporate trustee's compensation or of proper trust administration expenses after Settlor's death.

(Trial Court Opinion at 2–5). The trial court explains the history of events leading up to the present appeal as follows:

*Insufficiency of Trust Income and Funding Proposal*

19. [S.H.] Hagen and F.W. Hirt both previously exercised their powers to withdraw all of the principal, other than Class B Shares, from his or her respective Hirt Trust pursuant to subparagraph 3.01(A) of the Hirt Trust Agreement. Consequently, the only assets of each such trust currently are 1,170 Class B Shares (38.11% of the outstanding Class B Shares), which cannot be distributed, withdrawn or appointed under the express terms of the Hirt Trust Agreement. The corporate trustee's compensation and proper trust administration expenses that are either due and payable or can reasonably be anticipated to become due and payable from time to time from the H.O. Hirt Trusts, may exceed the dividend income received by the Class B Shares held in the H.O. Hirt Trusts (such excess is referred to as the *"Excess Expenses"*).

20. On March 3, 1999, Bankers Trust Company filed with this Court a Petition to Accept Resignation of Trustee. On May 7, 1999, this Court entered an order accepting the resignation of Bankers Trust Company, which will become effective upon the appointment of a successor corporate trustee. A successor corporate trustee has not yet been appointed by this Court,[3] but the proposed candidates have indicated they would seek a level of annual compensation that, without regard to any other expenses, would exceed the dividends received annually from the Class B Shares.

21. During any period in which the principal of the H.O. Hirt Trusts is comprised entirely of Class B Shares and the dividend income from those shares is insufficient to pay the Excess Expenses, the Trustees are unable to pay any Excess Expenses without either selling Class B Shares, or converting Class B Shares to Class A Shares and selling those shares. Either action would result in a sale or other disposition of Class B Shares. The express terms of the Hirt Trust Agreement prohibit the sale or other disposition of Class B Shares unless the extraordinary conditions specified in Article IV of the Hirt Trust Agreement quoted above have been satisfied. In addition, the express terms of the Hirt Trust Agreement prohibit the disposition of less than all of the Class B Shares held in the H.O. Hirt Trusts. Thus, the prohibition in the Hirt Trust Agreement against sale or other disposition of Class B Shares held thereunder conflicts with the Trustees' need to raise funds to pay the Excess Expenses.

22. By Order dated February 23, 2000, this Court directed [S.H.] Hagen

---

**3.** The appointment of a corporate trustee is the subject of lengthy ongoing litigation be- tween the various trustees.

and F.W. Hirt, as the individual trustees of the H.O. Hirt Trusts, to develop a funding proposal to provide for a means of paying the Excess Expenses of the H.O. Hirt Trusts.

23. [S.H.] Hagen and F.W. Hirt, as individual trustees, agreed upon a plan that would generate the cash needed to pay the Excess Expenses, while preserving unified ownership and control of the Company to the extent possible. They submitted this plan to Bankers Trust Company for review and approval. All of the Trustees have approved this plan (the Funding Proposal).[4]

24. The Funding Proposal provides for the creation of two voting trusts (together, "Voting Trusts," and singularly, a "Voting Trust") pursuant to a voting trust agreement attached to the Petition as Exhibit C ("Voting Trust Agreement"). The H.O. Hirt Trusts will obtain the cash needed to pay the Excess Expenses through the sale of (i) voting trust certificates ("Voting Trust Certificates") representing the beneficial ownership interests in the Class B Shares that otherwise would be converted into Class A Shares, and instead will be held by the trustees of voting trusts to be governed by the Voting Trust Agreement ("Voting Trustees"), or (ii) Class A Shares ("Class A Shares") of the Company (obtained from the conversion of Class B shares held in the H.O. Hirt Trusts). To the extent that Hagen and Hirt family members exercise their options to purchase Voting Trust Certificates, the Trustees and the Voting Trustees will vote, in the aggregate, the same percentage of the Class B Shares that the Trustees would have voted if no need to pay Excess Expenses existed.

Accordingly, the Funding Proposal minimizes, to the extent possible, the diminution of the voting control now held by the H.O. Hirt Trusts and thus preserves the unified ownership and control of the Company.

25. In summary, the Funding Proposal provides as follows:

(a) On a regular, periodic basis, the Trustees will determine the amount of the Excess Expenses of each Hirt Trust then held under the Hirt Trust Agreement. In addition, the Trustees will determine the smallest whole number of Class B Shares from each Hirt Trust which, if converted into Class A Shares and thereafter sold on the open market, would generate enough cash to pay the Excess Expenses of such Hirt Trust; provided, however, that the smallest whole number of Class B Shares so determined shall be reduced if necessary so that the Trustees do not dispose of Class B Shares pursuant to the Funding Proposal to the extent that the Class B Shares thereafter owned by all of the H.O. Hirt Trusts then in existence would be less than fifty-one (51) percent of the then outstanding Class B Shares.

(b) Prior to the conversion of Class B Shares into Class A Shares, the beneficiary of each Hirt Trust and his or her respective descendants or other eligible purchasers as described in paragraph 2.2 of the Voting Trust Agreement (essentially on a per stirpes basis), will have the option to purchase Voting Trust Certificates representing the beneficial ownership interests in the Class B Shares that

---

**4.** The Trustees filed their "Verified Petition of Trustees for Construction of Henry Orth Hirt Trust" on September 10, 2001.

otherwise would be converted into Class A Shares.

(c) If any option holders exercise the options to purchase Voting Trust Certificates, (i) those option holders will deliver their consideration for their purchases to the Trustees, thus enabling such Trustees to pay the Excess Expenses, (ii) the Class B Shares that otherwise would have been converted into Class A Shares instead will be held in each separate Voting Trust for the benefit of [S.H.] Hagen, F.W. Hirt or their respective descendants, the Voting Trustees always will be the same as the Trustees under the Hirt Trust Agreement and (iii) those option holders will receive the Voting Trust Certificates they have purchased. The Voting Trustees will be required to vote the Class B Shares held in the Voting Trusts in exactly the same manner as the Trustees vote the Class B Shares held in the H.O. Hirt Trusts.

(d) A Certificate Owner may transfer any Voting Trust Certificate owned, or cause the Class B share represented by such certificate to be converted to Class A shares, but in their case only if such certificate is first offered to the Trustees of the Hirt Trust from which the Class B Share represented by the certificate was derived, or its successor trusts, and next to the beneficiary of such Hirt Trust and his or her respective descendants or other eligible purchasers as described in paragraph 3.4 of the Voting Trust Agreement (essentially on a per stirpes basis).

(e) Any purchaser of a Voting Trust Certificate from the Trustees of the H.O. Hirt Trusts or from another Certificate Owner may pay as consideration for such purchase cash or Class A Shares.

(f) The Trustees will convert to Class A Shares those Class B Shares as to which the offers to purchase were declined, and will sell those Class A Shares when they deem appropriate. The Trustees will apply the proceeds of those sales to the payment of the Excess Expenses and will retain any proceeds exceeding the amount of the Excess Expenses in a reserve to be used for the payment of future Excess Expenses.

(g) The Trustees will charge annual corporate trustee compensation and proper trust administration expenses against the trust principal of each Hirt Trust to the extent that the trust income of such trust is insufficient to pay such corporate trustee compensation and expenses.

(Trial Court Opinion at 1–6).

¶3 On October 16, 2001, Appellant filed her answer and objections to the Trustees' petition for construction of the Hirt Trust. The trial court scheduled oral argument for January 25, 2002. Following oral argument, the court decided to hold the petition in abeyance until April 1, 2002, "to allow the parties an opportunity through mediation to determine whether a successor corporate trustee can be developed or procured whose fees and costs would be within the present annual income of the trust." (Order dated January 25, 2002). In a notice filed on April 12, 2002, the Trustees stated that the parties were unable to mediate a resolution.

¶4 On April 26, 2002, Appellant filed a petition to appoint Shepherd Asset Company as corporate trustee of the Hirt Trust. In this petition, Appellant proposes the creation of a "private trust company," the Shepherd Asset Company, to serve as the corporate trustee. Appellant proposes the Shepherd Asset Company could perform

the duties of a traditional corporate trustee for a fee less than the Trust's annual income, obviating the need to implement the Trustees' funding proposal. Appellant proposes this cheaper fee is possible because a private trust company has more freedom to control its operating expenses than a traditional corporate trustee. Appellant further proposes that the board of directors of this newly created entity include her and the three other grandchildren of the Settlor, as well as several independent board members. By virtue of Appellant's proposal, "the next generation of Hirt family beneficiaries" would have the opportunity to take an active role in the management of the Trust.

¶ 5 On May 17, 2002, the trial court entered a document entitled "Findings of Fact and Conclusions of Law and Order," which approved in all respects the funding proposal and voting trust agreement submitted by the Trustees. This timely appeal followed. In an order dated July 22, 2002, the court held in abeyance Appellant's petition to appoint Shepherd Asset Company as trustee of the Hirt Trust until this present appeal is resolved.

¶ 6 On appeal, Appellant raises the following issues for our review:

WHETHER [THE TRUSTEES] FAILED TO MEET THEIR EVIDENTIARY BURDEN OF PRESENTING SUFFICIENT EVIDENCE OF THE SETTLOR'S INTENT AS REQUIRED IN A CONSTRUCTION PROCEEDING, AND, WHETHER THE [TRIAL] COURT ERRED IN APPROVING THE VERIFIED PETITION OF TRUSTEES FOR CONSTRUCTION OF HENRY ORTH HIRT TRUST (THE "PETITION FOR CONSTRUCTION") AND THE FUNDING PROPOSAL CONTAINED THEREIN (THE "FUNDING PROPOSAL")[?]

WHETHER THE [TRIAL] COURT'S APPROVAL OF THE PETITION FOR CONSTRUCTION AND THE FUNDING PROPOSAL VIOLATED ESTABLISHED RULES OF TRUST CONSTRUCTION[?]

WHETHER THE RELIEF REQUESTED IN THE PETITION FOR CONSTRUCTION AND FUNDING PROPOSAL WAS FOR A TRUST MODIFICATION, RATHER THAN A TRUST CONSTRUCTION[?]

WHETHER THE COURT'S MODIFICATION OF THE TRUST AS INAPPROPRIATE WHERE THE [TRUSTEES] FAILED TO MEET THEIR BURDEN OF SHOWING THAT A MODIFICATION ADHERED TO THE SETTLOR'S INTENT AND WAS APPROPRIATE GIVEN CIRCUMSTANCES UNFORESEEN BY THE SETTLOR[?]

(Appellant's Brief at 6).

¶ 7 Appellant contends the court violated several well-established principles of trust construction when it approved the Trustees' funding proposal. First, Appellant asserts that where a trust is ambiguous, the party requesting the trust construction must bear the burden of demonstrating that the construction is consistent with the settlor's intent. Appellant argues that extrinsic evidence must be examined to determine the settlor's intent when the document itself is ambiguous. The only evidence offered by the Trustees during the January 5th hearing was the testimony of Carol Harrington, Esquire, a trust and trust taxation expert, who did not offer any testimony about the Settlor's intent. For this reason, Appellant believes the Trustees have failed to establish that their proposed trust construction is consistent with the Settlor's intent.

¶ 8 Appellant next complains that the funding proposal directly violates the plain meaning and specific language of the Trust. Appellant maintains that specific trust language must always prevail over "general administrative language." Appellant is convinced the sections of the Trust that create a corporate trustee and provide for its payment are merely administrative provisions, which are not critical components of the Trust's primary purpose. Appellant concludes the trial court erred by favoring the "general" language providing for payment of the corporate trustee over the "specific" language prohibiting the sale of Class B stock.

¶ 9 Further, Appellant protests that the court exceeded the limits of trust construction when it adopted the Trustees' funding proposal. Relying heavily on *In re Kelsey's Estate*, 393 Pa. 513, 143 A.2d 42 (1958), Appellant contends that a court may not "rewrite" a trust to allow it to do something that is clearly and unequivocally proscribed against in explicit language. Appellant concludes the trial court's adoption of the trust agreement resulted in a modification, not a construction, of the Trust. Consequently, Appellant's next arguments pertain to trust modification under the principles of deviation.

¶ 10 Appellant sets forth two requirements that must be met before a court may modify or deviate from a trust agreement: 1) an unforeseen change in circumstances since the execution of the trust; and 2) frustration of the settlor's primary purpose by this change in circumstances if strict adherence to the trust's administrative *direction* is required. Appellant concedes that unforeseeable circumstances have led to a situation where the income provided by the Trust can no longer pay for the expenses generated by the Trust. However, Appellant believes that adoption of the funding proposal frustrates the Settlor's intent by favoring the "administrative" provisions regarding payment of a corporate trustee over the Trust's primary purpose of maintaining unified control of the Company through retention of Class B shares. In short, Appellant concludes the trial court misapplied the doctrine of deviation by "modifying" the Trust's primary purpose to save an administrative provision, instead of "modifying" an administrative provision to save the Trust's primary purpose. We do not agree.

¶ 11 Our standard of review from a final order of the orphans' court:

requires that we accord the findings of the orphans' court, sitting without a jury, the same weight and effect as the verdict of a jury; we will not disturb those findings absent manifest error; as an appellate court we can modify an orphan's court decree only if the findings upon which the decree rests are not supported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence.

*In re Benson*, 419 Pa.Super. 582, 615 A.2d 792, 793 (1992). Moreover, we will not reverse the trial court's credibility determinations absent an abuse of the court's discretion as fact-finder. *In re Ware*, 814 A.2d 725, 731 (Pa.Super.2002). On the other hand, we are not required to give the same deference to trial court's legal conclusions. *Id.* "Where the rules of law on which the [court] relied are palpably wrong or clearly inapplicable, we will reverse the [court's] decree." *Id.* (quoting *Horner v. Horner*, 719 A.2d 1101, 1103 (Pa.Super.1998)).

¶ 12 A trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the *property for* the benefit of another person, which arises out of the result of

a manifestation of an intention to create it. Restatement (Second) of Trusts, § 2. "A settlor may condition his bounty as suits himself so long as he violates no law in doing so." *In re Kelsey's Estate, supra* at 518, 143 A.2d at 45. When interpreting the provisions of a trust, the polestar in every trust is the settlor's intent and that intent must prevail. *In re Benson, supra* at 794. The settlor's intent:

> must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and...that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain.

*In re McFadden,* 705 A.2d 930, 931 (Pa.Super.1998). Furthermore, the rules for determining a settlor's intent are the same for trusts as for wills. *Id.* (quoting *In re Trust Estate of Pleet,* 488 Pa. 60, 68, 410 A.2d 1224, 1228 (1980)).

▮▮ ¶ 13 Where provisions of a trust instrument conflict, they should be read in such a fashion as to give effect to both and/or fulfill the intent of the settlor. *In re McCune,* 705 A.2d 861, 867 (Pa.Super.1997), *appeal denied,* 555 Pa. 720, 724 A.2d 935 (1998). However, "courts cannot rewrite a settlor's deed of trust or distort his language or the language of a statute in order to attain what is believed to be beneficial or wise or even what it is believed that the settlor would or should have provided if he possessed a knowledge of all presently existing circumstances." *In re Benson, supra* at 793.

▮▮ ¶ 14 Here, the parties agree that the primary purpose of the Trust is to preserve the family's unified and centralized control and ownership of the Erie Indemnity Company. To that end, the Trust specifically limits the sale of Class B shares, which are the only class of shares that carry voting power. Currently the Trust's principal consists entirely of Class B shares. Sometime prior to the onset of the current funding crisis, S.H. Hagen and F.W. Hirt exercised their rights under Article III, Section 3.01(A)(1) of the Trust to withdraw all Class A stock from the Trust's principal. Article III, Section 3.01(A)(1) of the Trusts reads, in pertinent part: "In addition, said [children of the Settlor] shall have the right to withdraw any or all of the principal [of the Trust], exclusive of the shares of Class B capital stock of ERIE INDEMNITY COMPANY." (H.O. Hirt Trust at 4). Thus, S.H. Hagen and F.W. Hirt, the children of the Settlor, had unrestricted authority to withdraw all of the Class A shares held as Trust principal. Although the withdrawal of the Class A shares eliminates one option for alleviating the current funding shortage, it was by no means the cause of it. Rather, it was the unexpected increase in the fees of the corporate trustee that precipitated the current funding problem. Moreover, even if the Settlor's children had decided to leave some of their Class A shares in the Trust in anticipation of a funding shortage, how could they have foreseen how much should have been left in or how fast the excess expenses would have depleted these funds in any event? We note the decision of the Settlor's children to exercise their rights under the Trust and withdraw the Class A shares is not the subject of this appeal.

¶ 15 The Trust specifically creates a third trustee, the corporate trustee, and provides for its payment from the Trust's funds. This corporate trustee is the only trustee that is not also a beneficiary of the Trust. The Trust explicitly states that the corporate trustee must not be paid from

principal during the Settlor's life, but does not provide any restrictions on its payment after the Settlor's death.

¶ 16 When it became apparent that the Trust's annual income could no longer pay for the expenses it generated, the court instructed the Trustees to formulate a plan that would provide for payment of the Trust's excess expenses while maintaining the Trust's primary purpose. The chief obstacle faced by the Trustees, and the crux of this appeal, is simply that the Trust holds nothing else of value but the Class B stock, the sale of which is severely limited by the Trust. The trial court made the following findings of fact regarding the apparent conflict in the Trust document:

15. Thus, paragraph 4.05 of the Hirt Trust Agreement provides for both the annual compensation of the corporate trustee and special compensation for such trustees for services performed in connection with the Settlor's estate. This paragraph authorizes the corporate trustee to sell securities to pay any portion of "such compensation" that is chargeable against principal. However, the authorization to sell securities to pay "such compensation" appears immediately after the provision regarding compensation for services rendered in connection with the Settlor's estate, and not the annual compensation of the corporate trustee. In addition, the general authorization to "sell securities," even if it were to be clearly applied to annual corporate trustee compensation, conflicts with the specific prohibition against the sale or other disposition of the Class B shares unless certain extraordinary conditions are met. Accordingly, it is not clear whether the Trustees are expressly authorized to sell any Class B shares to pay the corporate trustee's annual compensation. Moreover, even if this subparagraph were to be read to authorize the Trustees to sell

Class B Shares to pay the corporate trustee's compensation, this express authorization remains limited to the payment of corporate trustee's compensation, and does not include other proper trust administrative expenses that the Trustees must pay.

16. No other provision of the Hirt Trust Agreement addresses the payment of the corporate trustee's compensation and proper trust administrative expenses from the H.O. Hirt Trusts.

\* \* \*

18. Paragraph 4.05 of the Hirt Trust Agreement also provides that, during the Settlor's life, the corporate trustee's compensation shall be charged wholly against income, unless the Settlor directs otherwise. The Hirt Trust Agreement lacks provisions for the apportionment of the corporate trustee's compensation or of proper trust administration expenses after Settlor's death.

(Trial Court Opinion at 4–5).

¶ 17 The trial court explained a trustee's duty to pay administrative expenses as follows:

17. Pennsylvania statutes direct a trustee to pay administrative expenses:

[T]he trustee, until it is distributed or sold, shall have the right to and shall take possession of, maintain and administer each real and personal asset of the trust, collect the rents and income from it, **and make all reasonable expenditures necessary to preserve it.**

20 [Pa.C.S.A.] § 7131 (emphasis added).

\* \* \*

Under the Pennsylvania Principal and Income Act, trustee's compensation may be apportioned between trust income

and principal as this Court directs. 20 [Pa.C.S.A.] § 8111(b). The Pennsylvania Principal and Income Act charges all ordinary trust administration expenses incurred in connection with the trust estate or with its administration and management to trust income, and to the extent that income is insufficient, to trust principal. 20 [Pa.C.S.A.] § 8111(a). All other proper trust administrative expenses are charged to trust principal. 20 [Pa.C.S.A.] § 8111(c).

(*Id.*) Thus, the trial court determined that the provisions of the Trust prohibiting the sale of Class B shares conflict with both the Trust's language providing for payment of the corporate trustee and Pennsylvania law. After a thorough review of the certified record, we agree with the trial court that there is no ambiguity in the language prohibiting the sale of Class B shares. There is, however, an apparent conflict in the Trust between its limitation on the sale of Class B shares and its directions for payment of proper expenses. *See In re Benson, supra; In re Kelsey's Estate, supra.* The current funding dilemma arose out of the tension between the Trust's directions for payment of the corporate trustee and its limitations on the sale of Class B shares.[5] It is on this ground, and not because of any ambiguous Trust language, that we agree the Trust must be constructed to allow implementation of the Trustees' funding proposal. *See id.*

¶ 18 Moreover, we do not agree with Appellant's assertion that the creation and compensation of the corporate trustee is a relatively unimportant "administrative provision" of the Trust that must be abandoned in light of the prohibition of the sale of Class B stock. The overall scheme of the Trust envisions a distinctive and critical role for the corporate trustee: a neutral decision-making entity created to minimize the risk of self-dealing by the remaining trustee/beneficiaries. For instance, the Trust explicitly states that the corporate trustee shall be the custodian of the trust property, and charges the corporate trustee with the responsibility of performing all administrative and bookkeeping duties. The Trust also states that the corporate trustee must prepare the Trust's tax returns. Thus, the Settlor minimized the risk of impropriety among the trustee/beneficiaries by assigning the job of safeguarding the books and trust property to a neutral third party, the corporate trustee.

¶ 19 Additionally, Section 4.03 of the Trust permits the Trustees to dispose of all Class B shares if the sale best serves the purpose of maintaining family control over the Company. Section 4.04, however, mandates that this decision to dispose of all Class B stock must include the affirmative vote of the corporate trustee. In other words, the affirmative majority vote of the two trustee/beneficiaries will not be sufficient to allow such a sale without the affirmative vote of the corporate trustee.[6] This restriction makes sense when viewed in light of the Settlor's overall plan to

---

**5.** The Trust's preamble explicitly creates the corporate trustee, and Article IV of the Trust charges the corporate trustee with specific duties and instructs that it must be paid. (*See* H.O. Hirt Trust at 1, 9, 12). However, Article IV also restricts the sale of Class B shares. (*See* H.O. Hirt Trust at 11). Because the Trust holds nothing of value except for the Class B shares, there is no way to satisfy both

of these directives. Thus, the funding shortage has created the apparent conflict in the Trust.

**6.** However, the affirmative vote of the corporate trustee and one other trustee would be sufficient to dispose of the Class B shares under Section 4.04 of the Trust.

prevent the Trust's beneficiaries from squandering control of the Company for quick personal profit.

¶ 20 Thus, both the creation of a corporate trustee and the limitations on the sale of Class B stock are important means by which the Settlor intended to advance his purpose of maintaining unified and centralized family control of the Erie Indemnity Company. Because we see an apparent conflict in certain provisions of the Trust, we must examine whether the trial court's construction of the Trust is proper in light of the Settlor's primary purpose of maintaining unified family control of the Company.[7]

¶ 21 The trial court made the following findings of law with respect to the Trust and the Trustees' funding proposal:

> 26. The implementation of the Funding Proposal is consistent with, and, in fact, would promote the purpose of the H.O. Hirt Trusts recited in subparagraph 4.03(B) of the Hirt Trust Agreement by perpetuating, to the extent possible, the retention of the Trustees' right to vote (and any other right associated with the right to vote) the Class B Shares currently held in the H.O. Trusts, thereby preserving unified ownership and control of the Company, while providing a mechanism for payment of the excess expenses.

> 27. This court finds that, in general, the conversion of Class B Shares in the H.O. Trusts to Class A Shares and their sale would constitute a sale or other disposition of Class B Shares, which is prohibited by the express terms of the Hirt Trust Agreement unless certain conditions of subparagraph 4.03 of the Hirt Trust Agreement are satisfied. In

addition, this court finds that subparagraph 4.03(c) of the Hirt Trust Agreement would prohibit the sale or other disposition of less than all of the Class B Shares in any transaction. This court also finds that the disposition of Class B Shares to pay all of the excess expenses is not expressly addressed by the authorization in subparagraph 4.05 of the Hirt Trust Agreement to sell securities only to pay certain compensation of the corporate trustee. This court also finds that the sale or other disposition of some of the Class B Shares also conflicts with Settlor's intention to preserve unified ownership and control of the Company.

> 28. This court further finds that the Trustees must be able to pay the excess expenses and that Settlor did not intend to provide otherwise. Thus, this court finds that an exception to the prohibition against the sale or other disposition of Class B Shares held in the H.O. Hirt Trusts must necessarily apply under certain circumstances to pay the excess expenses of the H.O. Hirt Trusts. Accordingly, this Court finds that the best possible construction of the Hirt Trust Agreement under the circumstances that would effectuate Settlor's intent and the purposes of the H.O. Trusts should include an exception to the general prohibition against the sale or disposition of Class B Shares that permits: (1) the transfer of less than all of the Class B Shares held in the H.O. Trusts to the Voting Trusts, but only to the extent that the Class B Shares retained by the Trustees in the H.O. Hirt Trusts thereafter would not be less than fifty-one (51) percent of the then outstanding Class B Shares, (2) the conversion of

---

7. Section 4.03 of the Trust would authorize the Trustees to sell all, but not less than all, of the Class B stock in order to pay off the Trust's excess expenses. However, selling $200,000,000 of Trust principal to pay off a trust debt of a few hundred thousand dollars is a solution that neither party advocates.

such Class B Shares to Class A Shares, to the extent necessary, to pay the Excess Expenses after the Voting Trust Certificates have been offered for sale [to the beneficiaries], and (3) the sale of such Class A Shares, in each case only in accordance with the Funding Proposal and Voting Trust Agreement, and for the sole purpose of, and only to the extent necessary for, the payment of excess expenses.

29. This court finds that the Hirt Trust Agreement is silent as to the apportionment of the corporate trustee's compensation and proper trust administration expenses between income and principal. To maintain consistency between the allocation of expenses and the receipts used to pay for them, this court construes the Hirt Trust Agreement to charge corporate trustee compensation and proper trust administration expenses against trust principal, to the extent that trust income is insufficient to pay such compensation and expenses.

\* \* \*

32. This Court construes the Hirt Trust Agreement to provide that the sale of Voting Trust Certificates in accordance with the Funding Proposal does not violate the fiduciary prohibition against self-dealing or any other fiduciary duty of the Trustees or the Voting Trustees.

(Trial Court Opinion at 7–9). We review the certified record to ascertain whether this construction and implementation of the Trustees' funding proposal is consistent with the Settlor's intent.

8. One voting trust for the S.H. Hagen Trust and one for the F.W. Hirt Trust.

9. At the January 25, 2002 hearing, Ms. Harrington testified that these fees were in the

¶ 22 First, the funding proposal sets up a mechanism by which the beneficiaries of the Trust and their descendents will have an opportunity to preserve the Trusts' share of Class B stock by purchasing voting trust certificates. These voting trust certificates represent the number of Class B shares that would need to be sold to pay the Trust's excess expenses. The Class B shares represented by purchased voting trust certificates will be transferred to two newly created voting trusts.[8] The same Trustees from the original Trust govern the voting trusts, and they must vote the Class B shares in the voting trusts in exactly the same manner as the shares held in the original Trust. The only Class B shares that would be converted to Class A shares and sold on the open market are those Class B shares that are not sold to the Trust's beneficiaries as voting trust certificates. In essence, by purchasing voting trust certificates, the beneficiaries and their descendents can preserve unified family control of the Company by preventing the conversion of Class B shares into Class A shares. This "right of first refusal" built into the funding proposal advances the primary purpose of the Trust by limiting sale of Class B stock while simultaneously generating funds to pay the Trust's excess expenses.

¶ 23 Even if the beneficiaries and their decedents decline to purchase voting trust certificates under the funding proposal, the funding proposal would still have a minimal effect on the Trust's control of the Company. The projected annual expense of retaining a corporate trustee for a trust this size is $400,000 to $500,000.[9] Carol Harrington, Esquire, a trust and trust taxation expert, testified that the annual trust

range of what she has seen for a trust of this size. Appellant did not contest the reasonableness of these figures.

income currently amounts to approximately $220,000. Subtracting the two figures leaves an annual excess expense of approximately $300,000. Ms. Harrington testified that the Trustees would be required to convert and sell approximately five Class B shares per year to meet this projected excess expense. The Trust became irrevocable on the Settlor's death in 1982, and will exist for a life in being plus twenty-one years. Because at the time of the Settlor's death there was a newborn beneficiary in existence, Ms. Harrington approximated the life of the trust as follows: ninety (90) years for the newborn's life plus twenty-one (21) years minus the twenty (20) years that have elapsed since 1982, rounded up to approximately one hundred (100) years.[10] Converting and selling five Class B shares per year over one hundred years would dilute the Trust's control over the Company from seventy-six percent (76%) to seventy-two percent (72%). If the amount of excess expense were to increase to $600,000 annually, the Trust's control over the Company would still only decrease to sixty-five percent (65%) over the next one hundred years.

¶ 24 Furthermore, the funding proposal contains a safeguard that prevents the Trustees from ever selling more Class B shares than would dilute the Trust's share of Class B stock below fifty-one percent (51%). Thus, the funding plan guarantees that the Trust and the Hirt family will always exercise majority control over the Trust.

¶ 25 Finally, there is no evidence that implementation of the Trustees' funding proposal would have any impact whatsoever on the subscribers or policyholders of Erie Indemnity Company, let alone a negative impact. The funding proposal simply permits the Trustees to sell a minimal amount of their control of the Company to pay for the Trust's excess expenses. The primary expense that necessitated the funding proposal in the first place is the payment of the corporate trustee, which the Settlor created to protect the Company and its subscribers from any self-dealing on the part of the Hirt family. The funding proposal does not alter the Company's corporate bylaws, articles of incorporation, board of directors, or the value of either Class A or Class B shares. However, altering the Company's corporate bylaws, the articles of incorporation, the board of directors, or the value of Class A or Class B shares, raised by the Dissent as alternative remedies, directly target Erie Indemnity Company, not the Trust, and would certainly have a direct and unforeseeable impact on the interests of the Company's subscribers, shareholders, and policyholders.[11]

---

10. We acknowledge that Ms. Harrington's calculations held constant the current annual dividend paid to the Class B stock, and thus did not account for any deviation from the Trust's current annual income.

11. The only proposals before the trial court were the funding proposals of the Trustees and Appellant. Therefore, other possible funding solutions, including the return of the Class A shares to the Trust principal, are not properly before us.

Nevertheless, when a corporation generates sufficient net profit to declare a dividend among shareholders, the decision lies within the discretion of the board of directors. *Levin v. Pittsburgh United Corporation et al.,* 330 Pa. 457, 199 A. 332 (1938); *McLean et al. v. Pittsburgh Plate–Glass Co. et al.,* 159 Pa. 112, 28 A. 211 (1893). The extent of the dividend issued to shareholders depends on many factors, including the company's need to accumulate reserves to strengthen its credit, increase its working capital, carry out contemplated projects of expansion, and provide contingencies against future hazard. *Jones v. Costlow et al.,* 349 Pa. 136, 141–42, 36 A.2d 460, 463–64 (1944). Here, we cannot predict the impact an increased dividend would have on the Corporation, and think it unwise, and probably unethical, for the

¶ 26 Moreover, we reject Appellant's argument that the court performed a "modification by deviation" rather than a construction of the Trust document.[12] The doctrine of deviation allows modification of the terms of a trust's administrative provisions when there is both an unforeseen change in circumstances and a frustration of the settlor's main objectives by this change if strict adherence to the settlor's directions is required. *See In re Barnes Foundation,* 453 Pa.Super. 436, 684 A.2d 123 (1996).

¶ 27 Here, the trial court interpreted two conflicting provisions of the Trust to effectuate the Settlor's primary purpose. The resolution of two conflicting provisions, both of which appear to advance the Trust's primary purpose, is more appropriately characterized as a construction rather than as a modification. *See In re McCune, supra* (constructing trust to alleviate internal conflict in trust's definition of scope of trustee's duties); *In re Deed of Trust of McCargo,* 438 Pa.Super. 570, 652 A.2d 1330 (1994), *appeal denied,* 543 Pa. 693, 670 A.2d 141 (1995) (using extrinsic evidence to construct proper definition of "issue" in trust).

¶ 28 As an alternative to the Trustees' funding proposal, Appellant petitioned the court to appoint the Shepherd Asset Company as corporate trustee. Appellant's petition regarding this plan has been held in abeyance pending resolution of the current appeal. However, we note that the proposed "private trust company" is not a state-chartered trust company, but an entity whose stated goal is to administer trusts relating to family and charitable purposes. We are skeptical whether a "private trust company" could manage a Trust that controls a publicly traded company of the size, scope, and importance of the Erie Indemnity Company. We also note that Appellant's proposal to pack Shepherd Asset Company's board of directors with interested Hirt family members creates friction with the Settlor's overarching scheme of having a neutral and independent corporate trustee.

¶ 29 There is no simple fix to the problem before us. The funding proposal offered by the Trustees and approved by the trial court is a superior plan in that it provides a viable and flexible mechanism for payment of the Trust's expenses while insuring that the Hirt family, through the Trust, will maintain unified control of the Company. In other words, the funding

Trustees to meddle into the discretionary business affairs of the board of directors to generate more Trust income. Essentially, the Trustees would be leveraging the publicly traded Corporation to subsidize the Hirt family Trust through inflation of Class B stock dividends. Moreover, in a case involving a family dispute over trust construction, we see a remedy directed at the Trust document as far more appropriate than one proposing to alter the articles of incorporation or corporate bylaws of a multi-million dollar corporation.

12. Interpreting the court's action as a deviation does not necessarily preclude the adoption of the Trustees' funding proposal. Appellant concedes that at the time the Trust was created, it was likely that the Settlor did not anticipate that the annual fee charged by a corporate trustee would inflate from $10,000 to almost $500,000, rendering the Trust's income insufficient to support its expenses. The limitation on piecemeal sale of Class B shares could be viewed as an administration provision designed to advance the Settlor's goal of maintaining unified family control of the Company. Strict adherence to the explicit tenets of the Trust would require the Trustees to sell all Class B shares in order to pay the excess expense, a decision clearly in conflict with the Settlor's intent. Thus, the court properly adopted the funding proposal, even if it deviated from the express prohibition against piecemeal sale of Class B shares, to accomplish the Settlor's ultimate objective of preserving unified family control of the Company. *See In re Barnes Foundation, supra.*

proposal advances the Trust's primary purpose in the least intrusive way, while substantially preserving nearly all of the Settlor's specific instructions for a long time into the future. The court's construction of the Trust was reached only after a thorough and comprehensive study of the four corners of the Trust document, Pennsylvania law on trusts, and the expert opinion testimony of Ms. Harrington. Moreover, we note that the Honorable William R. Cunningham has presided over litigation concerning this Trust and these parties for more than four years, and his detailed knowledge of the H.O. Hirt Trust is evident from the record.

¶ 30 Based upon the foregoing, we hold that the court's construction of the Trust is a sound reflection of the Settlor's intent under these circumstances. The Trust should be read to allow the adoption of the funding proposal, which solves the problem of the Trust's excess expenses while advancing the Trust's primary purpose of preserving within the Hirt family the unified and centralized control of the Erie Indemnity Company. Accordingly, we affirm the court's order that construed the Hirt Trust to allow implementation of the Trustees' funding proposal and voting trust agreement.

¶ 31 Order affirmed.

¶ 32 Judge BENDER filed a Dissenting Opinion.

### DISSENTING OPINION BY BENDER, J.:

¶ 1 I respectfully dissent. As noted by the Majority, subparagraph 4.03(C) of the Hirt Trust Agreement states, in part, that:

> The Trustees will therefore maintain and preserve ownership of all shares of class B capital stock of ERIE INDEMNITY COMPANY unless and until they shall determine, subject to the specific provisions of paragraph 4.04, that the sale, exchange in a corporate combination or reorganization, or other disposition by the Trust of such ownership will best serve said purpose, in which event they are authorized to sell, exchange in a corporate combination or reorganization, or otherwise dispose of the ownership of all, but not less than all, of said shares, for whatever consideration and upon whatever terms they may determine.

¶ 2 I believe that the language, "dispose of the ownership of all, but not less than all," is not ambiguous. It clearly states that all the shares of the class B capital stock are to be sold if any shares of the class B capital stock are sold. I cannot fathom how the Trustees, the trial court and the majority can support the order in question in light of this language.

¶ 3 The disregard of the Trust's primary purpose of maintaining unified family control of Erie Indemnity Company is even more remarkable given that the amount necessary to compensate the corporate trustee and pay administrative expenses is at most $300,000 per year. Recognizing the Majority's stated valuation of the Trust principal at $200,000,000, see Majority Opinion at footnote 6, the $300,000 is only 0.15% of the entire $200,000,000 principal. Thus, I note that the clear language of the Trust is being ignored solely to raise 0.15% of the value of the entire Trust principal on an annual basis.

¶ 4 I first question why the Trustees/Beneficiaries of the Trust withdrew or permitted the withdrawal of all Trust assets with the exception of the class B shares. Paragraph 5 of the trial court opinion indicates that at one time the Trust possessed, in addition to 76.22% of class B shares, 50% of the Company's class A shares. Although the record before this Court does not reveal the value of 50% of

the Company's class A shares, given that 76.22% of the class B shares are valued at more than $200,000,000, I can assume that 50% of the class A shares have substantial value. The withdrawal of all Trust assets except the B shares caused the situation, which currently is being addressed. Had the Beneficiaries left a small percentage of A shares in the Trust, those A shares would have paid dividends and could have been sold to pay trust expenses as they arose. Given the amounts of money involved, I must assume that the Beneficiaries were represented by counsel and were aware of the consequences of their actions. By stripping the Trust of all assets which could be sold, they have intentionally created the present situation.

¶ 5 Subparagraph 4.03(b) of the Hirt Trust Agreement states that:

The Settlor hereby declares that the purpose of this Trust is to create and preserve unified ownership and control of ERIE INDEMNITY COMPANY as a means of preserving the existence of ERIE INSURANCE EXCHANGE and ERIE INDEMNITY COMPANY as viable entities capable of furnishing insurance to subscribers at the Exchange and employment to loyal employees of the Exchange and the Company. The Settlor further declares that in his experience in the insurance business over half a century, including the Great Depression of the 1930's, World War II, and the Korean and Vietnam wars and several recessions, he has never lost sight of the fact that ERIE INSURANCE EXCHANGE, as a reciprocal insurer, was organized and exists primarily for the benefit of its subscribers or policyholders and that therefore the interests of the people who put their trust in the Exchange for the protection of their personal business affairs must come first. However, when the Exchange is healthy, its managing attorney-in-fact, ERIE IN-

DEMNITY COMPANY, will necessarily be prosperous and healthy, to the benefit of the stockholders of the latter. The Settlor therefore urges that the Trustees familiarize themselves with the nature of reciprocal insurers in general and that the ERIE INSURANCE EXCHANGE in particular; that in the discharge of their trust duties they concentrate, in cooperation with the Board of Directors of ERIE INSURANCE COMPANY and the individual whom the Board designates from time to time as "Manager" of the Exchange and Company, to keep ERIE INSURANCE EXCHANGE in the best of health; and that only when the task proves impossible shall they consider what then appears to them to be a logical change to prevent deterioration and possible disaster to the interests of all concerned.

¶ 6 Is the action of taking all marketable assets, which could have paid administration expenses from the Trust, an action which accrues to "the benefit of its subscribers or policyholders?" Was the action putting first the interest of people who put their trust in the Exchange for the protection of their personal business affairs? I do not think so. The Settlor urged the Trustees to familiarize themselves with the nature of reciprocal insurers in general and the Erie Insurance Exchange in particular. Can it be argued at this time that the Trustees/Beneficiaries did not know what the removal of the Trust's marketable assets would mean? If only class B shares remain and the sale of one class B share requires the sale of all class B shares, that is what must be done. The import of both subparagraph 4.03(B) and 4.03(C) leads one to believe that the Settlor envisioned a time when the best interest of the Exchange would not be served by the current arrangement. He set forth a procedure to end the current arrange-

ment. However, it is apparent that he did not intend the piecemeal dismantlement of the Exchange at the expense of subscribers or policyholders.

¶ 7 There are alternative methods to avoid the sale of all class B shares, even given the removal of all marketable assets from the Trust. One method would entail the return of sufficient assets to supply a fund for the payment of administrative expenses. Since the Trust currently has annual dividend and interest income of about $220,000, that income could be supplemented by such a fund or by annual contributions.

¶ 8 Another alternative would be to simply require Erie Indemnity Company to pay more dividends to the class B shares. While there might be some corporate restriction to such a plan, the Articles or Bylaws could be amended to eliminate such a restriction. Obviously, the sale of all class B shares could have a very dramatic impact on Erie Indemnity Company, one I am sure the family members would want to avoid.

¶ 9 Finally, we must not lose sight of the fact that the Trust owns 76.22% of the class B voting shares, thus, the Trust controls, admittedly indirectly, Erie Indemnity Company. The Settlor intended to create and preserve unified ownership and control of Erie Indemnity Company. The granting of 76.22% of the class B shares to the Trust, coupled with the prohibition of the partial sale of said shares, was the technique used by the Settlor to achieve that goal.

¶ 10 I believe that the order on appeal disregards the general intention of the Settlor and, more specifically, overlooks the unambiguous language of subsection 4.03(C) of the Trust. Therefore, I cannot join the Majority's decision to affirm. Rather, for the reasons stated above, I

would vacate the May 17, 2002 order and remand for further proceedings.